1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9               FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   MONTERIO MAURICE ROBERTS,            No.  2:20-cv-0872 TLN KJN P
12              Petitioner,
13        v.                              FINDINGS & RECOMMENDATIONS
14   NEIL MCDOWELL,
15              Respondent.
16

17   I.  Introduction

18        Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his May 27, 2016 conviction

20   for murder with a knife.  Petitioner was sentenced to 15 years to life, plus one year for a weapon

21   enhancement, in state prison.  Petitioner raises the following claims: (1) trial court erred in

22   instructing the jury on landlord/tenant law because it was irrelevant to the criminal charges;

23   (2) trial court improperly denied his request for a pinpoint instruction clarifying imperfect self-

24   defense; (3) trial court erred in denying defense's motion to exclude Edward White's statement;

25   (4) prosecutorial misconduct in closing argument; (5) trial court improperly limited cross-

26   examination of a witness; (6) trial court erred in denying his motion for a new trial based on a

27   Brady violation; (7) new evidence discovered after trial shows that the prosecutor knowingly

28   withheld impeachment evidence at trial; (8) prosecutor failed to correct false testimony; and

                                        1

1  (9) cumulative error.  (ECF No. 20.)  After careful review of the record, this Court concludes that

2  the petition should be denied.

3  II.  Procedural History

4       On October 22, 2015, a jury found petitioner guilty of second degree murder of Edward

5  White and found as true the allegation that petitioner personally used a deadly and dangerous

6  weapon.  (ECF No. 24-11 at 140.)  On May 27, 2016, petitioner was sentenced to 15 years to life

7  plus one year determinate term in state prison.  (Id. at 190.)

8       Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

9  District.  (ECF Nos. 24-14 to 24-19.)  The Court of Appeal affirmed the conviction on November

10  19, 2018.  (ECF No. 24-20.)  Petitioner filed a petition for review in the California Supreme

11  Court, which was denied on February 13, 2019.  (ECF Nos. 24-22 & 24-23.)

12       Petitioner filed several state habeas petitions, which the California courts denied. (ECF

13  Nos. 24-24 to 24-26.)

14       Petitioner filed his second amended habeas petition on October 1, 2020.  (ECF No. 20.)

15  Respondent filed an answer.  (ECF No. 24 & 25.)  Petitioner did not file a traverse.

16  III.  Facts[1]

17       After independently reviewing the record, this Court finds the appellate court's summary

18  accurate and adopts it herein.  In its unpublished memorandum and opinion affirming petitioner's

19  judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District

20  provided the following factual summary:

21                    **I. BACKGROUND**

22       We review the trial record in the light most favorable to the
    prosecution and in support of the judgments. (*People v.*
23  *Jennings* (2010) 50 Cal.4th 616, 638-639.) In any event, most of the
    salient details are not in material dispute.

24
25       ***A. The Prosecution's Case***

26       Njoku owned a house in Sacramento. She lived elsewhere, renting

27  ───────────────
    [1]  The facts are taken from People v. Njoku, No. C082166, 2018 WL 6039321 (Cal. Ct. App.
28  Nov. 19, 2018), a copy of which was lodged by respondent as ECF No. 24-20.  Roberts and
    Njoku were co-defendants, and on direct appeal, Roberts joined Njoku's arguments.

rooms in the house to short term tenants, primarily single mothers with children. Njoku did not require credit or background checks, and allowed tenants to pay rent and deposits on a flexible schedule and in installments, as they were able. Njoku did not observe the usual formalities associated with the landlord/tenant relationship. Some tenants were not required to sign lease agreements. Others signed lease agreements, but were not given copies of those documents. In keeping with her informal approach to landlord/tenant matters, Njoku also made frequent unannounced visits to the house, using her own key to enter without knocking.

Although Njoku generally catered to single mothers, she also rented a room to White, a single father with a two-year-old son. Other tenants in the house during the relevant period included Jasmine Mann, a single mother with an eleven-month-old daughter, and Amanda Figueroa, a single mother with a five-or six-year-old son. At the time of the events detailed below, White had been living in the house for two weeks, Mann for three weeks, and Figueroa for three months. All had been either homeless or at risk of homelessness prior to taking rooms in Njoku's house.

Njoku and Mann had a disagreement several days before the stabbing. On Friday, November 14, 2014, Njoku appeared at the house unannounced and learned that Mann had violated house rules by allowing her sister to spend the night. She confronted Mann, saying, "You need to get the F out of my house, and I don't care where you go, but you need to go now." Mann and her daughter left the house, but returned the following night.

Njoku came back to the house on Sunday, November 16, 2014. Njoku confronted Mann again, saying, "What are you still doing here?" "You need to leave." Mann responded that she could not "just leave," adding that she had a right to three days' notice prior to being evicted. Njoku denied that she was under any obligation to give notice, saying, "you need to get the hell out of my house" and "this is my house, I don't have to give you a warning about how long you have to be out of here."

White, who was standing nearby, interjected. White agreed that Mann was entitled to notice. He added that he did not want to continue living in a house in which the parent of a small child could get kicked out without notice. He told Njoku to stop yelling at Mann and asked that she refund money he had already paid in rent. Njoku angrily responded, "You can leave, I don't care. And you're not getting your money back."

The argument continued in this fashion for some time, with Njoku and White yelling back and forth at one another. Eventually, White called his sister and asked her to pick him and his son up. Njoku responded, "If you are calling your sister I'm calling my family too." Njoku then phoned someone. Figueroa heard Njoku tell the person on the other end of the line that she had a tenant who did not want to get out of her house, and she needed help. Mann heard Njoku say, "My tenants are trippin.' Come. You need to get over here. I'm going to send you the address." Njoku then turned to Mann, saying "You're

3

about to go. You're about to leave."

Roberts and Simon knocked on the door a short time later. As noted, Roberts is Njoku's brother, and Simon, who is not a party to this appeal, is Roberts' wife. Njoku answered the door and showed Roberts and Simon to a common area (designated by the parties as "the northeast living room"), which was then occupied by White and Mann. A discussion ensued.

The discussion began civilly enough, with Simon telling White and Mann that she was celebrating a birthday that day. The mood changed, however, when Roberts began commenting on White's financial circumstances. According to Mann, Roberts said to White, "We wouldn't have this problem [referring to White's dispute with Njoku] if you was man enough to have a house for your kid; you wouldn't have to be renting a room." As Mann would later testify, "the argument was getting very heated, it felt like it was going to be a fight any moment."

At some point, White called 911.[2] A recording of the 911 call was played for the jury. On the recording, White can be heard explaining the situation with Njoku to the 911 operator in a measured tone of voice as an unidentified woman yells in the background. Later, White can be heard interacting with an unidentified man, saying, in a louder tone, "Don't—no, no, no. First of all, don't come in my—if we gonna do that we can do that. Don't—don't—better believe I'm not scared." Later still, White can be heard saying, "Dude, I've done martial arts all my life. Best believe I'm not scared." White can also be heard saying, "Bro, don't come at me like that." During the trial, Mann recalled that Roberts was "talking smack" and "running up on" White. White, for his part, was "upset" but "standing still." Following a further discussion, which was repeatedly interrupted by people speaking loudly in the background, the 911 operator agreed to send someone to the house.

[N.2 Njoku had called 911 earlier that day, saying that she needed help with some people who were staying in her house and being disruptive. Njoku cancelled the call a short time later.]

A short time later, Njoku, Roberts and Simon announced that they were going to the liquor store. As they were leaving, Njoku said, "We're about to go to the store, and when we come back it's about to get real turnt up in here." During the trial, Figueroa testified that she understood Njoku to mean that it was going to get "crazy," and "not in the fun way."

White called 911 a second time after Njoku, Roberts and Simon left. Believing the dispute to be over, White cancelled the earlier request for assistance, and then went outside and smoked a cigarette with Mann. White's two-year-old son also went outside. Mann's eleven-month-old daughter remained inside (in a common area designated by the parties as "the southeast living room") eating a snack and watching television in her stroller.

The calm was short lived. Njoku, Roberts and Simon returned to the

house after approximately thirty minutes. White and Mann went back inside. Figueroa went to her room and closed the door. Njoku saw Mann's daughter and said, "Why is the stroller on the carpet?" Njoku began to push the stroller towards a sliding glass door leading outside. Mann's daughter began to cry. Mann said, "Wait, get your hands off my daughter's stroller. You're not pushing my daughter outside." Njoku then reached down and "yanked" Mann's daughter, who was still strapped in, out of the stroller. Mann said, "What are you doing? Don't touch my daughter." White interjected, saying, "Don't touch her daughter. You're doing too much. Calm down." As Mann would later recall, everyone in the room started "yelling at each other" and "getting into it." With tempers rising, White called 911 a third time.

During the course of White's third 911 call (the substance of which is described below), Mann (along with her daughter) and White moved from the southeast living room to the northeast living room. Njoku, Roberts and Simon soon followed. Figueroa and her son remained in their room with the door closed. However, Figueroa opened the door and peeked out several times during the course of the ensuing altercation.

An audio recording of White's third call to 911 was played for the jury. The recording begins with White telling the 911 operator, "We have an emergency here. The landlord has come back and they're trying to fight the girl and ... [¶] ... and trying to take the baby and everything." Moments later, White can be heard yelling, "[Y]ou locked my son outside? Oh, my fuckin' God." An irate White continued, "Are you fucking serious? You locked my [two year old] outside. Oh, my God. No, she locked my son outside. She locked my son outside. Are—and you're laughing about it? What the fuck. Oh my God, oh my God. God Lord have mercy. Oh, my God." During the trial, Mann explained that White was yelling because his son had been locked outside, and he believed that Njoku was responsible. Mann testified that she had not seen Njoku lock the door, but confirmed that "she was laughing about it."

Moments later, White can be heard telling the 911 operator, in a more composed tone of voice, "My name is Edward White. They're in this house. We paid rent for it. She hasn't given us our rent back. This—this person is trying to invite more people, somehow he can come get me out of the house and everything like that." The 911 operator can be heard responding, "Okay. Who is he?" The following exchange can then be heard:

"[WHITE]: It's [unintelligible]. I got kids in here.

"911: Who's he?

"[WHITE]: I will fight for my rights on everything I love.

"911: Okay. Edward?

"[WHITE]: I don't know who this dude is but I guess it's her brother or something like that."

5

By now, Mann was seated in a recliner with her daughter in her lap. Roberts was standing approximately two feet away from Mann. White was standing approximately 16 feet away from Roberts, near the door to a utility room. During the trial, Mann testified that Roberts was angry, and moving closer to White. On the 911 recording, White can be heard saying, "Dude, I want you to come."

Njoku and Simon were also in the northeast living room. In Mann's opinion, Simon was trying to defuse the situation by drawing White's attention to the fact that his son, now in the northeast living room, was unharmed. By contrast, Mann recalled, Njoku was "in my face, just trying to fight."

Mann watched as Roberts pulled what appeared to be a switchblade knife out of his pocket. Roberts opened the knife with a flick of the wrist. He then walked across the room towards Njoku and White, using a gait that Mann described as "like a menacing kind of little thug." The verbal sparring continued. According to Mann, Njoku "was talking mess to [Mann], talking mess to [White], just kind of, in [her] opinion, um, making the scene bigger than what it had to be. It was like egging him on." As Mann put it, Njoku was "hyping [Roberts] up" and "playing like the instigator." On the 911 recording, White can be heard repeating the words, "Y'all doin' too much," against a background of excited crosstalk. Suddenly, Roberts charged White.

Roberts and White exchanged blows, with each man landing several punches. White, who was taller, appeared to gain the upper hand. At that point, Njoku and Simon joined the fray. As Mann would later testify, "all four were fighting." The scene was confusing, however, and Mann allowed that Simon may have been trying to break up the fight.

On the 911 recording, the sounds of a scuffle can be heard, punctuated by the sounds of one or more female voices screaming "Stop" and "Oh, my God." A muffled male voice can be heard saying, "Get off my wife." During the trial, however, Mann was adamant that White did not make physical contact with Simon.

The melee moved from the northeast living room to the adjoining utility room. Around the same time, Figueroa emerged from her room and saw Roberts, Njoku and Simon "take [White] down." Figueroa screamed at the group to stop and ran back to her room. Figueroa did not see a knife in Roberts' hands.

Mann, still seated in the recliner, heard Figueroa yelling "stop, stop," and another sound, which she believed to be the sound of White being stabbed. On the 911 recording, the sounds of a struggle can be heard, followed by the sound of groaning. Upon hearing these sounds, Mann sprang from the recliner with her daughter in her arms, grabbed White's son, and ran out the door.

Around the same time, Figueroa emerged from her room again and saw Njoku and Simon standing on either side of White, who was now lying on the ground in the fetal position. According to Figueroa,

Njoku and Simon were stomping on White's upper body. During the trial, Figueroa testified that she screamed at Njoku and Simon to stop. Figueroa recalled that Njoku looked in her direction but did not appear to see her. In Figueroa's words, Njoku "whipped her hair around and just looked like in my direction and just turned her head back, and it wasn't her, and then she just kept stomping." According to Figueroa, Njoku "looked crazed." Figueroa retreated to her room. Although Figueroa can be heard screaming at various points on the 911 recording, she could not make out the sounds of her own screaming during the stomping episode, or say when, in relation to the stabbing, the stomping might have occurred.

On the 911 recording, a man's voice can be heard saying, "Nigga get your fuckin' hands off me." Another male voice can then be heard saying, "You stabbed me really good. You stabbed me. You got me." Moments later, the same male voice can be heard saying, "Can somebody help me, please? I don't want to die for my son, please?" A woman's voice responds, "Get up."

Figueroa stayed in her room, listening, until the sounds of fighting stopped. When she came out, she saw White's body lying halfway in the utility room and halfway in the northeast living room. Njoku, Roberts and Simon were gone. Figueroa dragged White, who was still alive, into the northeast living room and called 911. As Figueroa spoke with 911, Njoku and Simon reappeared. Simon, a certified nurse's assistant, instructed Figueroa to apply pressure to White's wounds.

Figueroa held White and waited for paramedics to arrive. As she waited, she noticed Njoku and Simon running into the utility room and then out of the house, and then back again. During the trial, Figueroa estimated that Njoku and Simon completed this circuit at least three times. Figueroa also noticed that Njoku and Simon were moving things around in the utility room, as if they were looking for something. During the trial, Figueroa explained that she thought they were looking for White's phone, which was still connected to 911. White, still conscious, was also thinking about the phone. He begged Figueroa to join the search, saying "go get the phone because they're not going to be able to prove it unless they have that phone." Neither Njoku nor Simon offered to help White, who lay crying in pain on the floor.[3] Instead, Njoku told White to "shut the fuck up." Njoku then continued rummaging around in the utility room.

[N.3 Njoku did, however, place another call to 911, which she ended when she learned that Figueroa was already on the phone with 911.]

Meanwhile, Mann, having run to a neighbor's house, was placing her own call to 911. Mann told the 911 operator, "What happened, right, they started fighting and the guy took out the knife and he ran up on him and then next thing you know [White] hit him and then the, uh, guy had a knife again and they just start like crazy ass stuff. It was like a real, you know, scuffle." Moments later, Mann said, "I have no idea what happened. Because most likely he stabbed him because I think the other guy started beating him up so I think he stabbed him because I heard the sound and this is crazy. I can't believe he did that

7

like that. It's crazy."

Mann concluded the call with 911 and walked back to the house. By then, police officers and an ambulance had arrived. Mann watched as White was loaded on a stretcher into an ambulance. She then encountered Figueroa. Figueroa, who had already been contacted by responding officers, told Mann that she had seen Njoku and Simon stomping on White, and heard them "talking shit to him while he was dying." Figueroa told Mann that she had not reported these things to responding officers, as she had been afraid to do so.[4] Mann encouraged Figueroa to tell police what she had seen. Figueroa spoke with detectives a short time later and reported the stomping.

[N.4 During the trial, Deputy Adrian Zuniga, who responded to the scene, testified that Figueroa said that she had not seen any part of the altercation. Figueroa explained that she had been afraid to tell Zuniga the truth, as Njoku had been standing nearby.]

White was pronounced dead on November 16, 2014, at 6:14 p.m., an hour after he placed his final 911 call. An autopsy revealed that White had been stabbed three times: once in the chest and twice in the abdomen. The fatal wound was three and one quarter inches deep and struck White's inferior vena cava, a major blood vessel returning blood from the lower part of the body to the heart. White died from loss of blood.

Crime scene investigators found White's phone underneath a dryer in the utility room. Investigators also found bloody clothes in the trunk of a Dodge Avenger parked in front of the house, which was registered to Simon. DNA analysis indicated that the blood matched two contributors: White and Roberts. Investigators also found blood on the boots that Njoku had been wearing at the time of the stabbing. DNA analysis indicated that the blood on Njoku's boots matched White.

Police contacted Njoku and Simon at the scene. Roberts surrendered to police eight days later. He had a cut on his pinky finger and a wound on his stomach. Police photographed Roberts' injuries.

During the trial, Dr. Joseph Pestaner, a forensic pathologist, testified for the prosecution about White's cause of death. On direct examination, Dr. Pestaner was also shown photographs of the injury to Roberts' finger. Dr. Pestaner opined that the injury did not appear to be a bite wound, but was more consistent with the type of injury that sometimes occurs when a person using a knife encounters resistance, which causes their hand to come into contact with the blade.

On cross-examination, Dr. Pestaner was shown photographs of the injury to Roberts' stomach. Asked whether the wound was consistent with a bite mark, Dr. Pestaner responded, "I wouldn't—that wouldn't come to mind for me again on that. I mean, there's some wounds on the front of the abdomen. There are—again, it looks like there's a reaction to the edges of the wound. Perhaps they're more punctures and consistent with a—but I would—again, they just look

like wounds." On further cross-examination, Dr. Pestaner testified that he has "seen cases where people have bite marks." However, Dr. Pestaner allowed that he had never before been asked to render an opinion as to whether a particular injury was a bite mark. Dr. Pestaner noted that other experts are usually called to render such opinions.

### B. Defense Case

Roberts testified in his own defense. Roberts explained that he planned to have drinks with Njoku and Simon at the house to celebrate Simon's birthday. He denied that Njoku called him to help her in evicting her tenants. He also denied discussing the eviction of Mann and White during the trip to the liquor store with Njoku and Simon.

Roberts testified that he went into the kitchen after returning from the liquor store and overheard the confrontation between Njoku and Mann in the southeast living room. Roberts testified that Njoku ordered Mann to leave, and White interjected, saying "that's not fair, she shouldn't have to get out, and if she has to leave, he'll leave or something like that." According to Roberts, a discussion of prorated rent ensued, which came to an end when White discovered that his son had been locked outside. At that point, Roberts testified, White started screaming and "got in [Njoku's] face." According to Roberts, "He was pretty much pushing up on her, real close to her, and he kept saying that she locked his son outside." Roberts testified that he tried to separate White and Njoku, but only succeeded in drawing White's ire.

In Roberts' retelling, an enraged White reached over the heads of Njoku and Simon, who were standing between the two men, and struck Roberts at least three times. During the course of the altercation, Roberts said, the group backed into the utility room.

In the utility room, Roberts said, White "was swinging wildly, hitting everyone, hitting me some more, hitting my wife and sister." Although Roberts "got a couple of punches in," Njoku and Simon were both knocked to the ground. And Roberts himself was "getting beat on." According to Roberts, the brawl escalated further when White "went down on one knee," "buried his head into my stomach," clamped down with his teeth, and shook his head, "like he was a pit bull or something." Roberts testified that White briefly let go, and then bit him again. Roberts explained that the biting caused him to groan in pain, adding that some of the groaning sounds on the 911 recording came from him, not White. It was at that point, Roberts continued, that he pulled out his knife and stabbed White. According to Roberts, "I didn't even want to stab him, but he wouldn't stop, and he was hurting my wife and hurting my sister and hurting me." Roberts explained that he left the scene of the crime, and threw away the knife because he was scared.

Simon also testified. Simon explained that she and Roberts agreed to meet Njoku at the house because they were planning to eat dinner in the area. Simon maintained that Njoku did not say anything about problems with tenants when the plan for the evening was conceived.

Turning to the events immediately preceding the stabbing, Simon recalled that she returned from the liquor store with Njoku and Roberts and found Mann's baby eating noodles in her stroller in front of the television. Seeing the baby eating over the carpet, Njoku became agitated and grabbed the stroller. Mann said, "Don't touch my baby." White appeared, taking Mann's side in what was then still a verbal altercation. The group moved from the southeast living room to the northeast living room. White discovered that his son had been locked outside and became "hyped" and "angry." Simon tried to defuse the situation by pointing out that White's son was unharmed. In Simon's words, however, "he didn't calm down. He got angry." According to Simon, White "kinda, you know, pushed me out of the way. And then, um, I stumbled a little bit to my right, I believe." The next thing she knew, Simon continued, "the men were tussling."

Simon testified that White and Roberts traded blows, and then backed into the utility room. White gained the advantage, getting on top of Roberts, who was on the floor. Simon grabbed White's shirt and attempted to pull him off. As she did so, she heard Roberts say that White was biting him. She then heard "a grunt kinda noise" and the sound of glass breaking. Moments later, the fight was over. Simon testified that she did not see Roberts produce or use a knife. Simon denied stomping on White, and testified that she did not see Njoku stomping on White either.

After the stabbing, Simon testified that she went outside to see whether police were coming. She then went back inside. Simon denied that she rummaged through the utility room, searching for White's phone. Simon also stated that she did not appreciate the severity of White's injuries in the immediate aftermath of the stabbing.

On cross-examination, the prosecutor impeached Simon with a video recording of an interview in which she told police that she was outside at the time of the stabbing and did not know the man with the knife. Simon admitted that she lied to police. She explained that she was scared and trying to protect her husband. She added that, "I was absolutely wrong for lying, and I'm not proud of that, especially looking back at the tape. It was wrong." Several character witnesses testified that Simon has a reputation for helping others and finding peaceful solutions to interpersonal conflicts.

Njoku, 2018 WL 6039321, at *1-8.

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

1    Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

2  corpus relief:

3         An application for a writ of habeas corpus on behalf of a person in
          custody pursuant to the judgment of a State court shall not be granted
4         with respect to any claim that was adjudicated on the merits in State
          court proceedings unless the adjudication of the claim -
5
6         (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established Federal law, as
7         determined by the Supreme Court of the United States; or

8         (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
9         State court proceeding.

10  28 U.S.C. § 2254(d).

11    For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of

12  holdings of the Supreme Court at the time of the last reasoned state court decision.  Thompson v.

13  Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45

14  (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S.

15  362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly

16  established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859

17  (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may

18  not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

19  specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S.

20  Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).

21  Nor may it be used to "determine whether a particular rule of law is so widely accepted among

22  the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."

23  Id.  Further, where courts of appeals have diverged in their treatment of an issue, there is no

24  "clearly established federal law" governing that issue.  See Carey v. Musladin, 549 U.S. 70, 77

25  (2006).

26    A state court decision is "contrary to" clearly established federal law if it applies a rule

27  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

28  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

1    Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant

2    the writ if the state court identifies the correct governing legal principle from [the Supreme

3    Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[2]

4    Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see also Chia v.

5    Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, "a federal habeas court may not issue

6    the writ simply because that court concludes in its independent judgment that the relevant state-

7    court decision applied clearly established federal law erroneously or incorrectly.  Rather, that

8    application must also be unreasonable."  Williams, 529 U.S. at 411; see also Schriro v. Landrigan,

9    550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court,

10   in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state

11   court was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes

12   federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state

13   court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v.

14   Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus

15   from a federal court, a state prisoner must show that the state court's ruling on the claim being

16   presented in federal court was so lacking in justification that there was an error well understood

17   and comprehended in existing law beyond any possibility for fair-minded disagreement."  Id. at

18   103.

19        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

20   court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

21   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

22   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

23   § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

24   considering de novo the constitutional issues raised.").

25        The court looks to the last reasoned state court decision as the basis for the state court

26   ───────────────

27   [2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28   384 F.3d 628, 638 (9th Cir. 2004)).

1    judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

2    If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

3    previous state court decision, this court may consider both decisions to ascertain the reasoning of

4    the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

5    federal claim has been presented to a state court and the state court has denied relief, it may be

6    presumed that the state court adjudicated the claim on the merits in the absence of any indication

7    or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption

8    may be overcome by a showing "there is reason to think some other explanation for the state

9    court's decision is more likely."  Id. at 99-100.  Similarly, when a state court decision on

10   petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

11   habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

12   merits.  Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98).  If a

13   state court fails to adjudicate a component of the petitioner's federal claim, the component is

14   reviewed de novo in federal court.  See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

15          Where the state court reaches a decision on the merits but provides no reasoning to

16   support its conclusion, a federal habeas court independently reviews the record to determine

17   whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

18   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

19   review of the constitutional issue, but rather, the only method by which we can determine whether

20   a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

21   reasoned decision is available, the habeas petitioner has the burden of "showing there was no

22   reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

23          A summary denial is presumed to be a denial on the merits of the petitioner's claims.

24   Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

25   just what the state court did when it issued a summary denial, the federal court reviews the state

26   court record to "determine what arguments or theories . . . could have supported the state court's

27   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

28   arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

13

1    Court." <u>Richter</u>, 562 U.S. at 101.  It remains the petitioner's burden to demonstrate that 'there

2    was no reasonable basis for the state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d 925, 939

3    (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

4        When it is clear, however, that a state court has not reached the merits of a petitioner's

5    claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

6    habeas court must review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860 (citing <u>Reynoso v.</u>

7    <u>Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006)).

8    V.   <u>Petitioner's Claims</u>

9      A.   <u>Claim One: Eviction Instruction</u>

10        Petitioner claims that the trial court violated his Fourteenth Amendment right to a fair trial

11    when it instructed the jury on landlord tenant law, which was irrelevant to the criminal trial.

12    (ECF No. 20 at 5, 17-18, 24-27.)  He asserts that the erroneous instruction confused the issues and

13    allowed the jury to consider improper evidence. (<u>Id.</u> at 17-18; <u>see also</u> <u>id.</u> at 25 ("Here, the court

14    inserted a confusing factual issue into the instructions that was likely to prey on the jury's

15    sympathy, was partisan to the prosecution's framing of the case, and was further likely to mislead

16    the jury into believing that imperfect self-defense was not available as a defense."))  In response,

17    respondent argues that petitioner has not shown that the state court's rejection of this claim was

18    unreasonable.  (ECF No. 25 at 20.)

19        The relevant instruction reads as follows:

20                            **Eviction Process**

21      A tenant cannot be evicted without receiving at least:

22         1.   A 3-day notice to pay or quit, a 3-day notice to perform

23            covenant or quit, or 3-day absolute quit notice, or a 30-day or 60-day notice to terminate tenancy;

24        AND

25         2.   A summons and complaint;

26        AND

27         3.   A 5-day notice of sheriff's right to remove the

28            occupant(s).

1

2

> The defendants are not charged with violating any laws governing landlord/tenant matters, and you are not being asked to make any determinations concerning the lawfulness of Jasmine Mann's or Edward White's eviction.

3

4  (ECF No. 24-2 at 183.)

5      On the merits, this Court looks to the last reasoned state court decision in applying the 28

6  U.S.C. § 2254(d) standard.  Wilson v. Sellers, 138 S. Ct. 1188, 1191-92 (2018).  On direct appeal,

7  the state appellate court considered petitioner's claim, assumed the trial court erred in giving the

8  instruction, and concluded that any error was harmless because the eviction instruction did not

9  pose a substantial risk of misleading the jury.

10

11

> Next, Roberts contends the trial court erred by instructing the jury on the law of eviction. According to Roberts, the instruction was unnecessary and confusing, and may have led jurors to believe that imperfect self-defense would not be available if Njoku and Roberts acted unlawfully in attempting to evict White. Roberts additionally argues that the instruction preyed on the jury's sympathies and was "partisan to the prosecution's framing of the case." We assume without deciding that the trial court erred in giving the instruction, but find the error, if any, was harmless.

12

13

14

15

> *1. Additional Background*

16

17

> During the trial, the prosecution and defense each elicited testimony regarding the procedural requirements for effecting a lawful eviction. The prosecution proposed an instruction addressing the basic requirements for an eviction by way of unlawful detainer (the eviction instruction). Njoku's trial counsel objected, arguing that the proposed instruction was unnecessary and inappropriate. Roberts' trial counsel agreed. The prosecutor responded that the proposed instruction would help the jury understand the legal relationships between Njoku, as landlord, and White and Mann, as tenants.

18

19

20

21

22

> Following further argument, the trial court indicated it was inclined to give the eviction instruction, stating: "At the moment, with the state of the evidence as it is, there has been a great deal of questioning about the rules of the house and violating the rules of the house. [¶] All—seemingly the only reasonable explanation for that is that Ms. Njoku was justified in doing what she did or in attempting to evict Jasmine Mann. I don't know what other purpose there would be for that. [¶] .... And then again, there was a great deal of questioning about what rules existed and who was violating the rules and so on. And that was from multiple witnesses. [¶] There was also testimony so far that Mr. White was indicating you can't kick someone out without a three-day notice and so on and so forth. [¶] So I think it's an obvious question that the jury may have." The trial court agreed to consider a pinpoint instruction clarifying that Njoku was not being charged with violating landlord/tenant laws.

23

24

25

26

27

28

15

Njoku's counsel prepared a proposed pinpoint instruction. A modified version of the pinpoint instruction was included in the trial court's final instruction to the jury, which read as follows:

"A tenant cannot be evicted without receiving at least:

"1. A 3-day notice to pay or quit, a 3-day notice to perform covenant or quit, a 3-day absolute quit notice, or a 30-day or 60-day notice to terminate tenancy;

"AND

"2. A summons and complaint;

"AND

"3. A 5-day notice of sheriff's right to remove the occupant(s).

"The defendants are not charged with violating any law governing landlord/tenant matters, and you are not being asked to make any determinations concerning the lawfulness of Jasmine Mann's or Edward White's eviction."

The jury was also instructed with CALCRIM No. 571 on voluntary manslaughter as a lesser included offense of murder based on the theory of imperfect self-defense.[10] CALCRIM No. 571 provides, in pertinent part: "Imperfect self-defense does not apply when the defendant through his or her own wrongful conduct has created circumstances that justify his or her adversary's use of force." As we shall discuss, Roberts contends the eviction instruction may have led jurors to believe that an unlawful eviction could constitute the type of "wrongful conduct" that would foreclose an imperfect defense claim under CALCRIM No. 571.

[N.10 "An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death. [Citation.] Imperfect self-defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself. [Citation.] It is well established that imperfect self-defense is not an affirmative defense. [Citation.] It is instead a shorthand way of describing one form of voluntary manslaughter." (*People v. Simon* (2016) 1 Cal.5th 98, 132.)]

During closing argument, the prosecutor urged the jury to view the evidence from the perspective of the landlord/tenant relationship. According to the prosecutor, the evidence showed "how three people went over to forcibly and illegally evict two tenants, and how one of those tenants got stabbed to death." The prosecutor directed the jury's attention to the eviction instruction, stating, "You're gonna get this instruction. It just tells you what the law is. We're not doing torts here. This is not a civil suit about a landlord's wrongful eviction. It's simply there to give you what the law is and how that process is something we have in our society, because we recognize as a society that these are emotional issues." The prosecutor explained that a

16

landlord effecting a lawful eviction must follow a legal process that begins with notice and ends with a formal eviction by the sheriff. By contrast, the prosecutor argued, "This train that's put in motion by defendant Njoku is going in one direction, and it's moving quickly, okay, and it's gonna end with somebody getting hurt."

Defense counsel offered another view of the eviction issue. Roberts' trial counsel argued that the prosecutor's characterization of the case as an eviction gone wrong was nothing more than a "sympathy play." According to Roberts' trial counsel, the evidence showed that Roberts, Njoku and Simon "were together to celebrate a birthday, not to engage in some eviction process." Later, referring to imperfect self-defense, Roberts' trial counsel argued, "Now, the District Attorney may try and salvage things by saying Mr. Roberts was the aggressor or he set in motion—that he can't avail himself of this defense because the chain of events that occurred out there [was] set in motion by Ms. Njoku or Mr. Roberts. [¶] Folks, this wasn't about an eviction. If Edward White is tuning him up, if he's beating his ass, if he's throwing Ms. Simon around, that goes to Monterio Roberts' belief."

Njoku's counsel also focused on landlord/tenant issues, noting, "I[,] in my opening statement and throughout my questioning in the evidence brought up this whole issue about landlord/tenant room and board, and I did that because it was important for you to have an understanding in determining the facts, how and why these folks were at that home." With respect to the eviction instruction, Njoku's counsel explained, "The judge read you the instruction about the eviction process. She told you, though, that the defendants are not charged with violating any law governing landlord/tenant matters, and you are not being asked to make any determination ... any determinations concerning the lawfulness of Jasmine Mann's or Edward White's evictions."

### 2. Analysis

Roberts contends the trial court erred in giving the eviction instruction. He argues the attempted evictions of Mann and White had no bearing on any material issue, but the instruction created a misleading impression to the contrary. He theorizes that jurors may have understood the eviction instruction, in combination with CALCRIM No. 571, to mean that an unlawful eviction would foreclose a claim of imperfect self-defense. He further observes that the instruction may have played on jurors' sympathies. The People respond that the eviction instruction was relevant to the issues raised by the evidence and would "help the jury understand the dynamics between the parties and the case before it." We assume without deciding that the trial court erred, but find no prejudice.

"The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.'" (*People v. Saddler* (1979) 24 Cal.3d

671, 681.) Here, the lawfulness of the attempted evictions of Mann and White was largely beside the point. Whether or not Njoku or Roberts complied with the requirements for a lawful eviction was immaterial to their guilt or innocence, as the trial court and counsel all acknowledged. As such, the eviction instruction appears to us to have been unnecessary. We assume without deciding that the trial court erred in giving the instruction.

Where a trial court gives a legally correct, but inapplicable, instruction, the error "'is usually harmless, having little or no effect "other than to add to the bulk of the charge." '" (*People v. Lee* (1990) 219 Cal.App.3d 829, 841.) Use of an inapplicable or "abstract" instruction is generally "'"only a technical error which does not constitute grounds for reversal."'" (*People v. Cross* (2008) 45 Cal.4th 58, 67, quoting *People v. Rowland* (1992) 4 Cal.4th 238, 282.) "There is ground for concern only when an abstract or irrelevant instruction creates a substantial risk of misleading the jury to the defendant's prejudice." (*People v. Rollo* (1977) 20 Cal.3d 109, 123.) We review such an error under the reasonable probability standard of *Watson*, that is, whether it is reasonably probable Roberts or Njoku would have achieved a more favorable result in the absence of the error. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130; *People v. Debose* (2014) 59 Cal.4th 177, 205-206.) Reasonable probability in this context does not mean more likely than not, but merely a reasonable chance, greater than an abstract possibility. (*People v. Wilkins* (2013) 56 Cal.4th 333, 351.) "In determining whether there was prejudice, the entire record should be examined, including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict." (*Guiton, supra,* at p. 1130.)

We have reviewed the entire record and conclude that the eviction instruction posed no substantial risk of misleading the jury. The instruction made clear that, "The defendants are not charged with violating any law governing landlord/tenant matters, *and you are not being asked to make any determinations concerning the lawfulness of Jasmine Mann's or Edward White's eviction.*" (Italics added.) The prosecutor and Njoku's trial counsel each specifically called attention to the instruction, reiterating that the jury was under no obligation to consider the lawfulness of any attempted eviction. And Roberts' trial counsel specifically addressed the absence of any legal connection between the unlawfulness of any eviction and Roberts' claim of imperfect self-defense, stating, "Folks, this wasn't about an eviction." Thus, the eviction instruction and the arguments of counsel made clear that the unlawfulness of any attempted eviction was a mere background consideration, unnecessary to the determination of Roberts' or Njoku's guilt or innocence.

On the record before us, where the eviction instruction was clearly identified as superfluous by the trial court and counsel, we perceive no substantial risk that the jury would have relied on the instruction in rejecting Roberts' claim of imperfect self-defense. If we assume, as we must, that the jurors were intelligent persons, capable of understanding and correlating the given instructions (*People v. Posey* (2004) 32 Cal.4th 193, 218), then we must conclude that they

read and understood the eviction instruction, and recognized that the unlawfulness of any attempted eviction was immaterial to their evaluation of Roberts' claim of imperfect self-defense. Reading the record as a whole, we see no obvious conflict between the eviction instruction and CALCRIM No. 571, and have no reason to believe that jurors would have ignored the clear language of the former in order to arrive at an oblique and unnecessary interpretation of the latter.

As for Roberts' contention that the instruction was "partisan" to the prosecution's framing of the issues, we disagree. The prosecution and defense both emphasized aspects of the landlord/tenant relationship in closing argument. Although the prosecutor encouraged the jury to view the case as an eviction gone wrong, it was obvious that the prosecutor was concerned, not with Njoku's failure to comply with the unlawful detainer statutes, but with Roberts' and Njoku's willingness to use force. No reasonable juror would have believed that Njoku's failure to give notice or serve Mann with a summons and complaint were material to Roberts' claim of imperfect self-defense, particularly inasmuch as the eviction instruction made clear they were not. Rather, the jury would have understood the eviction instruction in the context of the prosecutor's larger argument that landlords attempting to recover possession of leased property must follow appropriate legal procedures, rather than rely on forcible self-help. Nothing in the record leads us to believe that the jury would have been confused or misled by the instruction.

In any event, there is no reasonable probability the error affected the outcome of the trial. (*People v. Guiton, supra,* 4 Cal.4th at pp. 1129-1130.) Contrary to Roberts' contention, this was not a close case. The evidence against Roberts and Njoku was exceedingly strong, if not overwhelming. There was ample evidence that Roberts and Njoku were aggressive and confrontational with Mann and White on the day of the stabbing. Although there was conflicting evidence as to which party was the primary aggressor during the fatal encounter in the northeast living room, the jury could reasonably accept Mann's version of events, which was corroborated, in important respects, by Figueroa's testimony and the various 911 recordings. By the same token, the jury could reasonably reject Roberts' version of events, which was premised on the notion that White lost control upon discovering his son had been locked outside. Although White was undeniably upset about his son, nothing in the record leads inexorably to the conclusion that he started the fight. To the contrary, the 911 recording supports an inference that Roberts and Njoku were the primary aggressors. The jury could also reasonably reject Roberts' claim that he acted in defense of Simon. In any case, it is not reasonably probable that the jury, having rejected any reasonable doubt as to whether Roberts lunged at White with an open knife, would have reached a different verdict had the eviction instruction not been given. We therefore reject the claim of error.

Njoku, 2018 WL 6039321, at *19-22.

An irrelevant or incorrect jury instruction is grounds for habeas relief only if "'the ailing

19

instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see also Gilmore v. Taylor, 508 U.S. 333, 342 (1993).  To demonstrate a constitutional error, "the defendant must show both that the instruction was ambiguous and that there was 'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt."  Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009). Courts should analyze the ailing instruction in the context of the entire trial record.  Estelle, 502 U.S. at 72.  The Supreme Court has cautioned that there are few infractions that violate fundamental fairness.  Id. at 72-73; see, e.g., Sarausad, 555 U.S. at 191-92; Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per curiam) ("Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation"); Jones v. United States, 527 U.S. 373, 390-92 (1999); Gilmore, 508 U.S. at 344.  Even if there was a constitutional violation, to obtain habeas relief, petitioner must also show that the error "had a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Brown v. Davenport, 142 S. Ct. 1510, 1517 (2022).

Here, the state appellate court assumed without deciding that the trial court erred in giving the instruction and found the error harmless.  Njoku, 2018 WL 6039321, at *20-21.  After reviewing the record, this Court concludes that the state court's decision was not contrary to or an unreasonable application of clearly established federal law.  Petitioner does not argue that the eviction instruction was erroneous under state law.  He only claims that the instruction was irrelevant to the criminal trial.  As the state appellate court noted, the trial court knew that the issue was tangential to the trial and instructed the jury that "[t]he defendants are not charged with violating any laws governing landlord/tenant matters, and you are not being asked to make any determinations concerning the lawfulness of Jasmine Mann's or Edward White's eviction."  (ECF No. 24-2 at 183.)  Furthermore, in closing arguments, the attorneys stressed that the landlord/tenant issues were not before the jury.  (ECF No. 24-10 at 305 ("You're going to get this instruction.  It just tells you what the law is.  We're not doing torts here.  This is not a civil suit about a landlord's wrongful conviction.  It's simply there to give you what the law is…."); ECF

No. 24-11 at 42-44, 100-01.)  Based on this record, it was not objectively unreasonable for the state appellate court to conclude that "where the eviction instruction was clearly identified as superfluous by the trial court and counsel, we perceive no substantial risk that the jury would have relied on the instruction in rejecting Roberts' claim of imperfect self-defense." Njoku, 2018 WL 6039321, at *21.  Courts have found no constitutional error when there was no reasonable likelihood that the jury could be misled by the challenged jury instruction.  See McNeil, 541 U.S. at 438 ("Given three correct instructions and one contrary one, the state did not unreasonably apply federal law when it found that there was no reasonable likelihood the jury was misled."); Castro-Gutierrez v. Barns, 590 F. App'x 674, 675 (9th Cir. 2015).  Petitioner has not presented a meritorious argument to show that the jury could have been reasonably misled by this instruction.

Even assuming the state court's decision was not objectively reasonable, petitioner has not suffered actual prejudice.  The Ninth Circuit has found that surplus jury instructions, which are irrelevant to the jury verdict, could not have had a substantial and injurious effect on the verdict. See, e.g., James v. Woodford, 360 F. App'x 939, 940-41 (9th Cir. 2010); Sinay v. Garcia, 243 F.3d 549 (9th Cir. 2000); Stanton v. Benzler, 146 F.3d 726, 729 (9th Cir. 1998).  There is no evidence suggesting that petitioner would have received a more favorable outcome without the challenged instruction.  This Court concludes that the state court's rejection of petitioner's eviction instruction claim was not contrary to, or an unreasonable application of, clearly established Supreme Court authority and recommends denying habeas relief on this claim.

B. Claim Two: Pinpoint Instruction

Petitioner claims that the state court erred when it affirmed the trial court's denial of his request for a pinpoint instruction clarifying imperfect self-defense (CALCRIM No. 571).  (ECF No. 20 at 28-34.)  In response, respondent argues that the state court's rejection of petitioner's pinpoint instruction claim was not objectively unreasonable.  (ECF No. 25 at 21-24.)

On direct appeal, the state appellate court addressed this claim as follows:

> Next, Roberts contends the trial court should have given a pinpoint instruction clarifying that imperfect self-defense "is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (People v. Vasquez (2006) 136

21

Cal.App.4th 1176, 1179-1180 (*Vasquez*).) We conclude that no such clarification was necessary.

### 1. Additional Background

As previously discussed, the trial court instructed the jury with CALCRIM No. 571 on the reduction of murder to voluntary manslaughter based on imperfect self-defense or imperfect defense of another. As noted, CALCRIM No. 571 provides, in pertinent part, "Imperfect self-defense does not apply when the defendant, through his or her own wrongful conduct, has created circumstances that justify his or her adversary's use of force."

Roberts' trial counsel requested a pinpoint instruction based on *Vasquez*. The pinpoint instruction would have qualified the above-referenced language as follows: "But the defense is available when the victim's use of force against the defendant is unlawful, even when [the] defendant set in motion the chain of events that led the victim to attack the defendant." The trial court denied the request, stating "the instructions that we're giving already as far as involuntary manslaughter and the eviction instruction that we're giving and the mutual combat instruction all adequately covers what needs to be covered in that regard. [¶] So I'm not going to do any additional language, because it appears redundant to me."

### 2. Analysis

"Upon proper request, a defendant has a right to an instruction pinpointing the theory of defense ... if the theory proffered by the defendant is supported by substantial evidence" (*People v. Randolph* (1993) 20 Cal.App.4th 1836, 1841), the instruction is a correct statement of law (*People v. Bivert* (2011) 52 Cal.4th 96, 120), and the proposed instruction does not simply highlight specific evidence the defendant wishes the jury to consider (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.)

The trial court may properly refuse an instruction highlighting a defense theory if it is "duplicative or potentially confusing." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1276.) "[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857; *see e.g.*, *Gonzales, supra,* at p. 1276 [trial court did not err in refusing to instruct jury that " 'a person is not guilty of murder simply because he or she failed to stop someone else from committing a murder' " where topic was covered by standard aiding and abetting and child endangerment instruction and "giving two different instructions on the same topics would risk confusing the jury"].) Put another way, "[t]here is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.) The failure to give an instruction on even an essential issue "may be cured if the essential material is covered by other correct instructions properly given." (*Ibid.*)

The proposed pinpoint instruction was based on *Vasquez*, a case in which the trial court refused to give any instruction on imperfect self-defense. (*Vasquez, supra,* 136 Cal.App.4th at p. 1178.) There, defendant Vasquez asked his cousin, Arechiga, to meet him and some friends in an alley. (*Ibid.*) Upon arriving, Vasquez accused Arechiga of raping another relative years before. (*Ibid.*) Arechiga lunged at Vasquez, who was confined to a wheelchair, and began to choke him. (*Ibid.*) Vasquez pulled out a gun and shot Arechiga. (*Ibid.*) Vasquez requested an imperfect-self defense instruction in the ensuing murder trial. (*Ibid.*) The trial court refused the instruction, stating that Vasquez had "created the need to defend himself by luring Arechiga to the alley to confront him." (*Id.* at p. 1179.) The court of appeal reversed, concluding that the trial court's view of imperfect self-defense was too narrow. (*Ibid.*) The court explained, "Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is *legally* justified in resorting to self-defense against the defendant. [Citation.] But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*Id.* at pp. 1179-1180.)

Here, unlike *Vasquez*, the jury was fully instructed on the theory of voluntary manslaughter based on imperfect self-defense. Roberts does not challenge CALCRIM No. 571 as an accurate statement of the law. Instead, he argues that the requested pinpoint instruction offered "an important clarification going to the crux of the defense of imperfect self-defense." But the proffered "clarification" was implicit in CALCRIM No. 571. By informing the jury that the victim's *justified* use of force would foreclose an imperfect self-defense claim, CALCRIM No. 571 adequately conveyed the converse, i.e., that the victim's *unjustified* use of force would *not* foreclose an imperfect self-defense claim. Likewise, by informing the jury that imperfect self-defense does not apply when the defendant's *wrongful* conduct creates circumstances leading to the victim's justified use of force, CALCRIM No. 571 adequately conveyed that the defense would be available if the defendant, *without acting wrongfully*, set in motion the chain of events that led to the victim's unjustified use of force. Thus, CALCRIM No. 571 adequately conveyed that imperfect self-defense was available as a defense, even if Roberts set in motion a chain of events that led to White's unjustified use of force.

Roberts argues that the prosecutor's focus on the theme of forcible eviction created a need for additional clarification, which the pinpoint instruction would have supplied. Specifically, Roberts argues that the pinpoint instruction would have clarified that, "Even if Njoku and [Roberts] were morally or even legally wrong in trying to evict Mann, White did not have legal justification for assaulting the defendants, and as long as White was not legally justified in using force, [Roberts] retained a right to self-defense and imperfect self-defense." The trial court did not abuse its discretion in declining to give the requested pinpoint instruction. Again, the obvious significance of the prosecutor's eviction argument was not that Njoku or Roberts were "morally or even legally wrong in trying to

1

2

3

4

5

6

evict Mann," but that they resorted to forcible self-help, with predictably tragic results. The instructions as a whole made clear that Roberts could defend himself against an unjustified use of force by White, even if Roberts was the initial aggressor in the fistfight between them. (See, e.g., *People v. Randle* (2005) 35 Cal.4th 987, 992-993 [car burglary defendant entitled to use deadly force in imperfect defense of another against burglary victim administering deadly street justice], overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) We therefore conclude that the trial court acted within its discretion in declining to give the proposed pinpoint instruction.

7

8

9

10

11

12

13

14

15

16

17

18

19

Even assuming the trial court erred, we discern no prejudice. The erroneous failure to give a proposed pinpoint instruction is reviewed for prejudice under the *Watson* standard, and reversal is required only if it is reasonably probable that the jury would have come to a different conclusion had the instruction been given. (*People v. Trinh* (2014) 59 Cal.4th 216, 233, 235.) No such probability exists here. As we have explained, CALCRIM No. 571 made clear that imperfect self-defense was available in the event that White used unjustified force. Referring to CALCRIM No. 571, Roberts' trial counsel also argued the defense was available, whether or not the chain of events was set in motion by Njoku or Roberts, "If Edward White is tuning [Roberts] up, if he's beating his ass, if he's throwing Ms. Simon around ...." And the prosecutor said nothing to suggest that imperfect self-defense would not be available in the event that White was found to have used unjustified force. On the record before us, even assuming error, Roberts was not prejudiced as nothing prevented the jury from adopting the defense theory, which was adequately conveyed by the instructions and covered by counsel's argument. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144-1145 [if failure to give pinpoint instruction was error, it was harmless because nothing in the instructions given precluded jury from adopting defense theory covered in counsel's argument]; *People v. Franco* (2009) 180 Cal.App.4th 713, 720 [when assessing claim of instructional error, appellate court considers the record as a whole, including arguments of counsel].)

20

Njoku, 2018 WL 6039321, at *22-23.

21

To the extent that petitioner argues that the instruction does not accurately reflect

22

California law, this claim is not cognizable on federal habeas review. The state appellate court

23

determined that requested pinpoint instruction was implicit in CALCRIM No. 571 and the trial

24

court, therefore, did not abuse its discretion in denying petitioner's request. Id. at *23. Whether

25

the given jury instructions accurately state California's imperfect self-defense based on People v.

26

Vasquez, 136 Cal. App. 4th (2006) is a matter of state law. This Court is bound to the state

27

court's interpretation of its own laws. Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Estelle, 502

28

U.S. at 67-68 ("[I]t is not the province of a federal court to reexamine state-court determinations

1    on state law questions.")

2          Even if petitioner's claim was cognizable on federal habeas review, this Court concludes

3    that the state court's determination was not contrary to or an unreasonable application of clearly

4    established federal law.  The Supreme Court has not held that a state court's failure to give a

5    pinpoint instruction on a defense theory violates a criminal defendant's due process rights.  See,

6    e.g., Larsen v. Paramo, 700 F. App'x 594, 596 (9th Cir. 2017); Duckett v. Godinez, 67 F.3d 734,

7    743 (9th Cir. 1995).  In one case, Henderson v. Kibbe, the Supreme Court rejected "the

8    suggestion that the omission of more complete instructions" on an issue at trial resulted in a

9    constitutional error.  431 U.S. 145, 156 (1977).  Although the Supreme Court in Mathews v.

10   United States, 485 U.S. 58, 63 (1988) stated that "a defendant is entitled to an instruction as to

11   any recognized defense for which there exists evidence sufficient for a reasonable jury to find in

12   his favor," the Ninth Circuit noted that the opinion merely recited a general proposition of federal

13   criminal procedure; "it did not recognize a constitutional right to a jury instruction."  Larsen, 700

14   F. App'x at 596.  Even so, the state court reasonably determined that the given instructions

15   adequately conveyed the defense.  Despite petitioner's claim that most jurors do not possess the

16   "legal sophistication…to ferret out the important legal principal that imperfect self-defense still

17   applied," ECF No. 20 at 32, jurors are presumed to follow the jury instructions.  Weeks v.

18   Angelone, 528 U.S. 225, 234 (2000).  Petitioner fails to present any evidence to the rebut this

19   presumption.  This Court recommends denying habeas relief on this claim.

20          C. Claim Three: 911 Recording

21          Petitioner claims that the trial court violated his Fourteenth Amendment right to a fair trial

22   when it denied his motion to exclude the victim's statement that he did not want to die for his son.

23   (ECF No. 20 at 34-35.)  In response, respondent argues that the state court's rejection of

24   petitioner's claim was not unreasonable.

25          In the last reasoned opinion, the state appellate court rejected petitioner's claim on the

26   grounds that the trial court did not abuse its discretion in finding the evidence relevant and not

27   prejudicial.

28          Njoku contends the trial court should not have admitted the portion

25

of the 911 recording in which White can be heard saying, "I don't want to die for my son." Specifically, Njoku contends the trial court abused its discretion and violated her constitutional right to due process because (1) the statement was not relevant to any disputed issue, and (2) any probative value was substantially outweighed by the risk of prejudice. We are not persuaded the trial court abused its discretion.

### *1. Additional Background*

Prior to trial, the prosecution filed a motion in limine seeking to admit the numerous 911 recordings made from the house on the day of the stabbing, including the recording of the White's third and final call to 911. Roberts filed a motion to exclude the portion of the recording in which White says, "I don't want to die for my son."[6] The trial court heard argument on the first day of trial.

[N.6 Roberts interpreted White's statement as, "I don't want to die *in front of* my son." The trial court found that the statement was actually, "I don't want to die *for* my son." "In other words," the trial court found, "I need to be here to take care of my son." No party challenges the trial court's finding.]

During the hearing, Roberts' and Simon's counsel argued that the statement was more prejudicial than probative under Evidence Code section 352. The prosecutor responded that the statement was relevant "because that's what [White's] thinking about when he's lying there after being assaulted by these people." Roberts' and Simon's counsel countered that White's state of mind was irrelevant, adding that the challenged statement would only serve to generate improper sympathy for the victim. The prosecutor responded: "He's actually asking for help. That's what this is about. And these two defendants [Njoku and Simon] that were rummaging around in a utility room looking for his phone while he's asking for help." Simon's counsel agreed that White's plea for help was relevant, but argued that the challenged statement—"I don't want to die for my son"—was separate and unrelated. Njoku's counsel joined in the arguments made by the other defense counsel.

The trial court ruled from the bench as follows: "In listening to the recording, it appears that prior to that what is very prominent on the recording is Mr. White yelling about somebody putting his son outside, and he's emphatic about that. [¶] And it seems to me that any testimony or evidence that may be presented that had to do with the alleged victim initiating any of this—and I'm anticipating that, I don't really know how the evidence is gonna go, but I'm anticipating that—certainly the fact that the—Mr. White's concern when he's yelling about putting his son outside and asking for help, the fact that he is saying ... 'I don't want to die for my son[,'] certainly is a reflection of the urgency in which he's asking for help, and that's what it appears to be on the [911] call. [¶] So there is some probative value to it."

The trial court continued: "The fact that his son was put outside, it's not gonna be a surprise to the jurors that there's a two-year-old son

that's part of this. [¶] And there were other children also present. In fact, you can hear children at different times on different calls. [¶] So it's not any more inflammatory than anything else that you hear on the call. And it does have some probative value." Accordingly, the trial court denied the motion to exclude the challenged statement.

### 2. Analysis

"Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' A trial court has 'considerable discretion' in determining the relevance of evidence. (*People v. Williams* (2008) 43 Cal.4th 584, 634.) Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. (*People v. Clark* [ (2011) ] 52 Cal.4th [856,] 893.) An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

Njoku's evidentiary challenge focuses on the prosecutor's argument that White's statement—"I don't want to die for my son"—was probative of his state of mind in the immediate aftermath of the stabbing. According to Njoku, the statement should have been excluded because White's state of mind was irrelevant to any disputed issue at trial. Njoku's argument ignores the fact that the statement was admitted on another ground. Although the prosecutor referred to White's state of mind at the hearing, the trial court considered the statement in the context of an anticipated self-defense claim and found that White's statement was probative of the "urgency" with which he pleaded for help. Rather than render comfort or assistance to the dying man, Njoku told him to "Get up," and then joined Simon in an incriminating search for White's cell phone.[7] The trial court could reasonably conclude that Njoku and Simon's callous response to White's plea was probative of their state of mind, and had a tendency in reason to rebut their claim that they acted in self-defense.[8] We cannot say the trial court abused its discretion in finding the statement relevant.

[N.7 Njoku observes that the prosecution never introduced any evidence from White's phone, and nothing in the record suggests that the phone contained incriminating evidence. Although the contents of the phone may have been of limited evidentiary value to the prosecution (particularly in view of the 911 recording), the trial court could reasonably conclude that Njoku and Simon's decision to search for the phone in the immediate aftermath of the stabbing was evidence of their consciousness of guilt.]

[N.8 In her reply brief, Njoku insists that White's statement cannot

27

be considered evidence of her state of mind. However, Njoku's argument depends on an unduly blinkered view of the evidence. Contrary to Njoku's suggestion, nothing in the trial court's ruling suggests that the statement, standing alone, was admitted as relevant evidence of her state of mind. Rather, Njoku's state of mind was reflected in her response to White's statement.]

Nor can we say the trial court abused its discretion in weighing the probative value of the statement against the risk of undue prejudice. We have listened to the 911 recording several times and agree with the trial court that the statement, "I don't want to die for my son," though heartrending, was no more inflammatory than anything else on the recording. The statement followed a prolonged struggle, which culminated in the sounds of a man groaning in pain and uttering the words, "My baby." These sounds were significantly more upsetting than the challenged statement, which was delivered in a comparatively calm tone of voice. As for the substance of the statement, the jury would not have been surprised to learn that White's son was present, or even that White was aware of the imminence of death. As the trial court suggested, there was ample evidence that children were present on the day of the stabbing, and White's son was involved in the events leading to the final confrontation in the utility room. There was also ample evidence that White knew he was at the point of death. Given the relevance of the statement to the anticipated self-defense claim, in highlighting Njoku's callous response to a dying man, we cannot say the trial court abused its discretion in finding its probative value was not substantially outweighed by the risk of undue prejudice.

"The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) Having concluded that the trial court did not abuse its discretion in admitting the challenged evidence, we must also conclude that defendant's due process rights were not violated. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029, citing *Falsetta, supra,* at pp. 916-918.)

Njoku, 2018 WL 6039321, at *8-10.

To the extent that petitioner challenges the admissibility of victim's statement, habeas relief is unavailable. The admission of evidence is a matter of state law. See Estelle, 502 U.S. at 67-68; Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Errors of state law do not warrant federal habeas relief. See Estelle, 502 U.S. at 67-68. "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995).

Assuming the claim is cognizable, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas

corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

Court." Holley, 568 F.3d at 1101; see also Walden v. Shinn, 990 F.3d 1183, 1204 (9th Cir.

2021). Because the Supreme Court has "not yet made a clear ruling that admission of irrelevant

or overly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of

the writ," Holley, 568 F.3d at 1101, this Court cannot conclude that the state court's ruling was

contrary to, or an unreasonable application of, clearly established federal law. See generally

Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam); Bradford v. Paramo, No. 2:17-cv-

05756 JAK JC, 2020 WL 7633915, at *6-7 (C.D. Cal. Nov. 12, 2020) (citing cases), adopting

report and recommendation, 2020 WL 7631441 (C.D. Cal. Dec. 22, 2020). Alternatively,

assuming there is clearly established law on this issue, petitioner's claim would fail on the merits.

The state court's determination that the victim's statement was relevant and not prejudicial was

reasonable. Njoku, 2018 WL 6039321, at *8-10; see also ECF No. 24-7 at 54-57. Accordingly,

habeas relief is not warranted.

### D. Claim Four: Prosecutorial Misconduct

Petitioner claims that the prosecutor made errors during closing argument that deprived

him of a fair trial, including: (1) encouraging the jurors to evaluate the evidence according to

community sentiment; (2) focusing on Simon for aiding and abetting; (3) telling jurors to remove

themselves they could not convict; and (4) arguing facts not in evidence and shifting the burden

of proof. (ECF No. 20 at 35-39.) In response, respondent argues that fairminded jurists could

agree with the state court's determination. (ECF No. 25 at 26-32.)

On direct appeal, the state appellate court evaluated and denied petitioner's claim.

> The Fourteenth Amendment to the United States Constitution is violated when a prosecutor's misconduct infects the trial with such unfairness as to deny due process. (*People v. Tully* (2012) 54 Cal.4th 952, 1009.) The misconduct must be significant enough to deny a fair trial. (*Ibid.*) Before a federal constitutional error can be deemed harmless, a reviewing court must declare it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

> Even if the prosecutor's misconduct does not result in a fundamentally unfair trial, California law is violated if the prosecutor uses deceptive or reprehensible methods in attempting to persuade the jury or the court. (*People v. Tully, supra,* 54 Cal.4th at pp. 1009-1010.) A violation of state law is cause for reversal only when it is

reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor not made the improper comment. (*People v. Milner* (1988) 45 Cal.3d 227, 245; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson* ).) In either case, only misconduct that results in prejudice requires reversal. (*People v. Fields* (1983) 35 Cal.3d 329, 363.)

When a prosecutor's closing argument is challenged, the question "'is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Harrison* (2005) 35 Cal.4th 208, 244; see *People v. Clair* (1992) 2 Cal.4th 629, 663.) The prosecutor's statements are examined in the context of the entire argument and the instructions given to the jury. (See *People v. Morales* (2001) 25 Cal.4th 34, 44-46.) We do not lightly infer that the jury drew the most, rather than the least, damaging meaning from the prosecutor's statements. (*People v. Shazier* (2014) 60 Cal.4th 109, 144; *People v. Dykes* (2009) 46 Cal.4th 731, 771-772.)

### 2. Sympathy for the Victim

During closing argument, the prosecutor reviewed the jury instructions for homicide (CALCRIM No. 500), focusing on the differences between first degree murder (CALCRIM No. 521), second degree murder (CALCRIM No. 520), and voluntary and involuntary manslaughter (CALCRIM Nos. 570, 571, 580). Turning to the element of malice, the prosecutor explained: "Malice aforethought can be divided into two categories. One is express malice. I'm going to kill you, all right, or I'm taking out a knife and I'm going to work so hard for so many minutes until I've stabbed you." The prosecutor continued: "All right. *That very act, stabbing someone to death, it's probably unfathomable for most of you to take out a knife, to open up a blade, and to take that blade to a person.* It's ...."[9] Roberts' counsel objected on grounds of prosecutorial misconduct and the trial court overruled the objection. Njoku argues the italicized language improperly played upon the jury's sympathy for White. We disagree.

[N.9 Here, and throughout this opinion, we have italicized the statements alleged to constitute misconduct.]

As a general rule, a prosecutor " 'may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim.' " (*People v. Lopez* (2008) 42 Cal.4th 960, 969.) Here, however, the prosecutor was not asking jurors to put themselves in White's shoes. Rather, the prosecutor was asking the jury to consider the crime from Roberts' perspective. Specifically, he was making the point that the act of stabbing someone to death requires a degree of sustained physical effort from which the jury could infer that the stabber acted with malice. That the prosecutor was asking jurors to put themselves in Roberts' shoes is clear from the very next thing he said, which was: "That act of stabbing someone to death takes a lot of work. And you heard it. You heard it on that recording. Okay. It was a protracted struggle. And finally, an hour—a minute and a half into it you hear Mr. White screaming.

Okay. That's how long he had to fight to get the knife into him. [¶] That very act in itself is an express intent to kill."

The prosecutor's remarks were not an invitation to jurors to view the crime through the eyes of the victim. (Cf. *People v. Arias* (1996) 13 Cal.4th 92, 160 [prosecutor committed misconduct by inviting jury to consider victim's rights], cf. *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [prosecutor committed misconduct by asking jury to reflect on all victim lost through her death].) Nor were they needlessly inflammatory or principally aimed at arousing the passion or prejudice of the jury. (See *People v. Farnam* (2002) 28 Cal.4th 107, 168 ["Prosecutors 'are allowed a wide range of descriptive comment and the use of epithets which are reasonably warranted by the evidence' [citation], as long as the comments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury"].) On the record before us, the prosecutor's discussion of the physical act of stabbing someone was a fair comment on the evidence, and within the wide latitude granted during argument. We therefore reject the claim of misconduct.

### 3. Community Standards

The prosecutor continued his closing argument, turning, eventually, to the instructions for aiding and abetting (CALCRIM Nos. 400, 401, 403). The prosecutor explained: "Aiding—aiding and abetting makes sense. And I understand it's not something that you have thought of many times, but in society we are very concerned, as a society, and it's reflected through our laws, that if multiple people get together and commit crimes, bad things will happen, okay, because now you're multiplying the force that's being used, if it's a violent crime, and you have more than one player, now the force used is multiplied." The prosecutor continued along these lines, emphasizing the policy judgments underlying the aiding and abetting laws. The prosecutor then said, "Okay. *In for a penny in for a pound. Okay. And that's us as a society speaking. We don't want groups of people beating up* ...." Simon's counsel objected on the grounds that the prosecutor's argument was based on "what society wants as opposed to following the law." Roberts' counsel joined in the objection.

The trial court responded: "What he referred to was society as a collection of our laws. So just rephrase." The prosecutor continued: "I'm talking about our laws, and that's all I'm talking about. These laws come down through centuries. Okay. Aiding and abetting has been around for probably a millennium. Our law is so old. You talk about Magna Carta and all that. We've had jury trials in [Anglo] American societies forever. Okay. Aiding and abetting, this is one of those laws that we've come up [with] as a community." Roberts' counsel renewed the objection, which was overruled. Njoku's counsel joined the objection out of the presence of the jury, after the prosecutor completed his closing argument. We assume without deciding that Njoku's claim was adequately preserved.

On appeal, Njoku argues the prosecutor's argument encouraged jurors to evaluate the evidence according to community sentiment,

rather than the law. We disagree. Contrary to Njoku's suggestion, the prosecutor's argument cannot be reasonably construed as an invitation to follow community standards or disregard the law. Rather, as the trial court suggested, the prosecutor's argument can be reasonably construed to mean that the law of aiding and abetting reflects society's view that a person who aids and abets the commission of a crime shares the guilt of the actual perpetrator. (§ 31.) We perceive no reasonable likelihood that the jury would have construed or applied the prosecutor's argument in an objectionable fashion.

### 4. Instruction to Jurors to Remove Themselves from the Jury

The prosecutor's discussion of aiding and abetting focused on Simon. Towards the beginning of his closing argument, the prosecutor acknowledged that Simon might pose a problem for the jury, "because she presents as such a normal person, and she had so much going for her." The prosecutor continued, "And you know, for some of you, having listened to these character witnesses—and mind you, character evidence can raise a reasonable doubt. That's the instruction you get. But some of you listening to this character evidence may have just gotten to a point where you no longer can evaluate the facts for what they are, okay, and her lies for what they are, but were just so struck by the tragedy that her life has taken by her actions on that day, you know, and you—again, I want you to be brutally honest with yourself, if that's where you are, we have a couple of alternates who can step in, okay, because this is about a deed."

The prosecutor then elaborated on the law of aiding and abetting, arguing that the evidence established Simon's derivative culpability for murder. Towards the end of this discussion, the prosecutor concluded, "You witnessed a murder. And it's a tragedy on so many levels. Obviously[,] Mr. White is no longer with us. That's the ultimate tragedy, but also Ms. Simon. [¶] And I remind you, okay, you cannot consider penalty or punishment. That is not for you to consider. That's the [j]udge's job. All right. *She'll make sure that the appropriate sentences are handed out according to the law. Okay.* [¶] *If you cannot do it, all right, if you can't do it because you feel sorry for Ms. Simon, you got to tell us, because you are not advocates.* [¶] *What I stand up here and say is not evidence. You decide what the evidence is. What they're gonna say is not evidence. You decide what the evidence is. The only way you can do that is if you're impartial and you're not rooting for anyone.*" The prosecutor then concluded his closing argument.

Njoku's counsel objected out of the presence of the jury, arguing: "He basically told this jury that if they cannot convict or feel they cannot convict, don't worry about it, get off the case, we'll bring an alternate in to do it." Njoku's counsel continued: "That's improper to leave these 12 jurors with the impression that if they don't go the way the prosecution feels they should go, just let the Court know, and we'll bring in an alternate. That's not proper argument." The trial court responded: "As I understood the argument in the context, it was if you're feeling sorry for Ms. Simon or if you have sympathy for

Ms. Simon and you because of that can't otherwise think clearly based on the law, which is how I took it when he gave the argument."

On appeal, Njoku argues the prosecutor committed misconduct by encouraging jurors to remove themselves from the jury if they could not convict. We assume without deciding the claim was preserved, noting that the trial court invited defense counsel to propose a curative instruction, which they failed to do. In any case, the claim lacks merit. In context, the prosecutor's argument was an invitation for jurors to speak up if they were so overcome with sympathy for Simon that they found themselves unable to follow the law as instructed. We do not lightly infer that the jury drew the most, rather than the least, damaging meaning from the prosecutor's statements. (*People v. Shazier, supra,* 60 Cal.4th at p. 144.) Furthermore, Simon was acquitted, without any of the jurors asking to be discharged. Had jurors understood the prosecutor's argument in the manner Njoku suggests, they would have either convicted or asked to be excused. On the record before us, where neither of these things happened, we perceive no reasonable likelihood that jurors understood the prosecutor to mean that they should remove themselves from the jury if they felt they could not convict. We therefore reject the claim of misconduct.

### 5. Arguing Facts not in Evidence and Shifting Burden of Proof

As noted, the defense theory was self-defense. In closing argument, Roberts' trial counsel stressed that White was a younger, taller man who claimed to know martial arts. According to Roberts' trial counsel, White threw Simon to the ground and then grabbed hold of Roberts' stomach with his mouth, causing Roberts to believe he was in imminent danger of being killed or suffering great bodily injury. Roberts' trial counsel urged the jury to "[l]ook at the bite mark to his belly."

In rebuttal, the prosecutor argued that White was fighting for his life in the utility room, and grabbed Roberts' stomach with an extremely tight grip, thereby causing the injury. The prosecutor reminded the jury that Roberts screamed, "get your fucking hands off me" during the height of the fight, not "stop biting me." Recalling Dr. Pestaner's testimony, the prosecutor also reminded the jury that, "The pathologist wouldn't say it was a bite wound. The pathologist—I think he testified he had done something like 6,000 autopsies. He's seen a few bodies. He's seen a few bite marks. He said that didn't look like a bite mark to him, you know." The prosecutor then noted that the defense had not brought in an expert to testify that the stomach wound was a bite mark, adding, "If you look at that photograph, it looks like maybe a snake bite. It looks like a really sharp, crescent sharp angle at the top, like maybe how fangs would bite, but it certainly doesn't look like teeth to me, and I wouldn't think it does to you either." No defense counsel objected to the prosecutor's argument.

On appeal, Njoku argues the prosecutor misstated Dr. Pestaner's testimony regarding the wound on Roberts' stomach. She also argues the prosecutor committed misconduct when he theorized, apparently

33

facetiously, that the wound might have been the result of a snake bite. She also argues the prosecutor shifted the burden of proof when he wondered aloud why no defense expert was called to testify that the wound was the result of a human bite. These claims are forfeited.

Generally, a defendant may not complain of prosecutorial misconduct on appeal unless the defendant raised a timely objection in the trial court on that ground and requested that the jury be admonished to disregard the impropriety. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) There are two exceptions to forfeiture: (1) the objection or the request for an admonition would have been futile; or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct. (*People v. Panah* (2005) 35 Cal.4th 395, 462.) A defendant claiming one of these exceptions must find support for it in the record. (*Ibid.*)

As noted, no objection was made to the purportedly improper argument in the trial court. Although Njoku finds fault with the prosecutor's argument on appeal, she does not address the forfeiture issue in her opening brief, let alone attempt to establish futility. Instead, Njoku raises a perfunctory futility argument in her reply brief, arguing for the first time that any failure to object was the result of ineffective assistance of counsel. We do not consider claims raised for the first time in a reply brief. (See, e.g., *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [claim of ineffective assistance of counsel raised for the first time in reply brief is forfeited].)

In any event, Njoku's claim of prosecutorial misconduct fails on the merits. Njoku argues the prosecutor misstated evidence by arguing that Dr. Pestaner testified the wound on Roberts' stomach was not a bite mark. As previously discussed, Dr. Pestaner testified that he had seen bite marks before, but had never been asked to render an opinion as to whether a particular wound was the result of a bite. When asked whether the wounds shown in the photographs of Roberts' stomach were bite marks, Dr. Pestaner responded, "I wouldn't—that wouldn't come to mind for me again on that." The prosecutor described Dr. Pestaner's testimony in appropriately circumscribed terms. Far from suggesting that the pathologist had offered a definitive opinion on the cause of Roberts' stomach wound, the prosecutor said that Dr. Pestaner "wouldn't say it was a bite wound" and "said that [it] didn't look like a bite mark to him." The prosecutor's account of Dr. Pestaner's testimony was not inaccurate. But even assuming, that the prosecutor misstated Dr. Pestaner's testimony, any such misstatement would have been harmless. The jury requested a read back of Dr. Pestaner's bite mark testimony during deliberations, and was therefore not dependent on the prosecutor's characterization.

Njoku argues the prosecutor committed misconduct in arguing the wounds were either the result of White's death grip or a snake bite, noting, "There was no evidence in the record to support either conclusion." Njoku is mistaken. As the People observe, there *was* evidence to support the conclusion that the wound was the result of an extremely tight grip: On the 911 recording, at the height of the struggle, Roberts can be heard saying, "get your fuckin' hands off me," not "get your mouth off me" or "stop biting me." The

prosecutor was free to argue that Roberts' statement supports an inference that White was clutching Roberts, not biting him. (*People v. Woods* (2006) 146 Cal.App.4th 106, 112 ["A prosecutor may fairly comment on and argue any reasonable inferences from the evidence"]; see also *People v. Collins* (2010) 49 Cal.4th 175, 230 ["the prosecutor 'enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom' "].) The prosecutor was also free to suggest, through the use of sarcasm, that alternative explanations for the wound were implausible. (See, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1154-1155 [prosecutor's use of "pungent language" not improper where "[i]t was clear the prosecutor's comment was aimed solely at the persuasive force of defense counsel's closing argument, and not at counsel personally"], disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) There is no reasonable likelihood that jurors misunderstood the prosecutor's argument.

Finally, we perceive no misconduct in the prosecutor's observation that the defense failed to call an expert to testify that Roberts' wound was a bite mark. While a prosecutor may not assert that a defendant was required to produce evidence, the prosecutor may comment that the defendant has not produced any evidence with respect to contested facts, particularly when the prosecutor also acknowledges the correct burden of proof. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1338-1340; *People v. Medina* (1995) 11 Cal.4th 694, 755; *People v. Bennett* (2009) 45 Cal.4th 577, 596.) Similarly, it is not misconduct for a prosecutor to point out the failure of the defense to call logical witnesses. (*Bradford, supra,* at p. 1340.) Here, Roberts put the cause of the injury on his stomach at issue by testifying that the wound was a bite mark. It was not misconduct for the prosecutor to comment on the credibility of Roberts' testimony or the state of the evidence more generally concerning the cause of the injury. Furthermore, the prosecutor made a point of reminding the jury, at the beginning of his rebuttal argument, that he had the burden of proof. On this record, we perceive no reasonable possibility that the jury would have understood or applied the prosecutor's argument in an objectionable fashion. Had the claim of prosecutorial misconduct been properly preserved and presented, we would have rejected it.

Njoku, 2018 WL 6039321, at *10-14.

In reviewing claims of a prosecutor's alleged misconduct, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also Parker v. Matthews, 567 U.S. 37, 45 (2012) (per curiam). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" Darden, 477 U.S. at 181 (citation omitted). "[A] court should not

1  lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or

2  that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less

3  damaging interpretations." Donnelly, 416 U.S. at 647.  In making its determination, the court

4  should consider the prosecutor's comments in the context of the entire trial record.  Hein v.

5  Sullivan, 601 F.3d 897, 912-13 (9th Cir. 2010).  "[T]he *Darden* standard is a very general one,"

6  and courts have "'more leeway . . . in reaching outcomes in case-by-case determinations.'"

7  Parker, 567 U.S. at 48 (quoting Alvarado, 541 U.S. at 664).  Even if there was prosecutorial

8  misconduct, habeas relief is only warranted if petitioner can establish that the error "'had

9  substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S.

10  at 637; see also Parle v. Runnels, 387 F.3d 1030, 1044 (9th Cir. 2004).

11        After reviewing the record, this Court concludes that the state court's rejection of

12  petitioner's prosecutorial misconduct claim was not objectively unreasonable.  Petitioner's

13  challenges concern four statements made by the prosecutor during closing argument, none of

14  which have merit.  (ECF No. 24-10 at 303-05; ECF No. 24-11 at 5-37, 111-27.)

15        First, petitioner argues that the prosecutor improperly invited the jury to put themselves in

16  the victim's place by stating "it's probably unfathomable for most of you to take out a knife, to

17  open up a blade, and to take that blade to a person."  (ECF No. 24-11 at 13; see also id. at 14

18  ("What do you think is going to happen when you're knifing someone, you know, into the body

19  towards their heart? You're gonna kill them.")) Defense counsel objected on the grounds of

20  improper argument, and the trial court overruled the objection.  (Id. at 13.)  After reviewing the

21  record, this Court concludes that the state appellate court reasonably determined that the trial

22  court did not err in overruling his objection; the prosecutor's statement was from the perspective

23  of petitioner, who stabbed the victim with a knife, not the victim.  Petitioner has not identified

24  any case law stating that asking the jury to view the crime from the perpetrator's perspective

25  constitutes misconduct.  Even if the statement could be viewed as asking the jury to put

26  themselves in the victim's position, the trial court instructed the jury to not let "bias, sympathy,

27  prejudice, or public opinion influence your decision."  (ECF No. 24-2 at 162.)  This Court

28  presumes that the jury followed this instruction.  Weeks, 528 U.S. at 234.

Second, petitioner contends that the prosecutor improperly argued that the jury should view the aiding and abetting charge in the context of what society wants rather than what is demanded under law.  (ECF No. 24-11 at 24-25.)  Defense counsel objected, and the trial counsel said "[w]hat he referred to was society as a collection of our laws.  So just rephrase."  (Id. at 25.)  The prosecutor clarified that he was talking about the laws.  (Id. ("Aiding and abetting, this is one of those laws that we've come up as a community."))  Contrary to petitioner's position, this Court finds that the state appellate court's rejection of petitioner's claim to be reasonable; as the state court noted "the prosecutor's argument can be reasonably construed to mean that the law of aiding and abetting reflects society's view that a person who aids and abets the commission of a crime shares the guilt of the actual perpetrator."  Njoku, 2018 WL 6039321, at *11.

Third, petitioner claims that the prosecutor asked the jurors to remove themselves from the jury if they could not convict Simon.  (ECF No. 24-11 at 16-22, 36-37.)  Defense counsel objected out of the presence of the jury, and the trial court overruled the objection, noting that it would consider additional instructions on the issue.  (Id. at 38-39.)  None were submitted.  Here, the state appellate court reasonably concluded that petitioner's claim lacks merit because the "prosecutor's argument was an invitation for jurors to speak up if they were so overcome with sympathy for Simon that they found themselves unable to follow the law as instructed."  Njoku, 2018 WL 6039321, at *12.  As the state court noted, courts should not lightly draw the most damaging inference from a prosecutor's comment, Donnelly, 416 U.S. at 647, particularly when the most damaging result here would have led either to Simon being convicted or jurors asking to be discharged, neither of which happened.  Njoku, 2018 WL 6039321, at *12.

Lastly, petitioner argues that the prosecutor (1) misstated Dr. Pestaner's testimony regarding the wound on petitioner's stomach, (2) made up evidence that the wound was a result of a death grip and looked like a snake bite, and (3) improperly noted that there was no defense expert to testify that the wound was a human bite mark.  (ECF No. 24-11 at 114-15.)  This Court reviewed the record and now concludes that the state appellate court's determination that this claim failed on the merits was not objectively unreasonable.  First, as the state court found, the prosecutor's account of Dr. Pestaner's testimony was not inaccurate.  Njoku, 2018 WL 6039321,

1    at *13.  The prosecutor accurately summarized the relevant testimony.  (Compare ECF No. 21-11

2    at 115 with ECF No. 24-9 at 52-60.)  Second, despite petitioner's argument to the contrary, there

3    was evidence that the wound was caused by a tight grip, rather than a human bite.  (Compare ECF

4    No. 24-11 at 114 with ECF No. 24-2 at 248 (911 recording where petitioner yells "get your

5    fuckin' hands off me."); ECF No. 24-9 at 56 ("I mean, teeth, even if they're from an animal, are

6    blunt force injuries of sorts.  So there's – it's just a wound.  It looks rather linear.  And I don't

7    know that I could make that into a bite mark."))  Third, as the state court noted, the prosecutor is

8    allowed to point out that defendant did not provide evidence on contested facts or call logical

9    witnesses.  Njoku, 2018 WL 6039321, at *14; see Darden, 477 U.S. at 182 (noting that defense

10   counsel made a tactical decision not to present other witnesses). The state court's decision was

11   not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

12   For all of the above reasons, this Court recommends denying habeas relief.

13          E. Claim Five: Limited Cross-Examination of Jasmine Mann

14          Petitioner claims that the trial court violated his Sixth Amendment confrontation right and

15   Fourteenth Amendment right to a fair trial when it denied him an opportunity to cross-examine

16   Jasmine Mann about her pending criminal case for assault with a deadly weapon.  (ECF No. 20 at

17   40-42.)  In response, respondent argues that petitioner fails to show that the state court's rejection

18   of his claim was unreasonable.  (ECF No. 25 at 35.)

19          The state court addressed this claim as follows:

20                  Next, Njoku argues the trial court abused its discretion and violated
                    her right to a fair trial by excluding impeachment evidence of a
21                  pending assault charge against Mann. Specifically, Njoku argues the
                    circumstances surrounding the pending charge were substantially
22                  similar to those presented in the instant case and would have cast
                    doubt on Mann's veracity. We find no error.
23

24                  *1. Additional Background*

25                  Prior to trial, the prosecution moved in limine to preclude defendants
                    from impeaching Mann with the facts underlying her pending assault
26                  charge. The motion averred that Mann was in custody, having been
                    arrested for assault with a deadly weapon (§ 245, subd. (a)(1) ) on
27                  August 10, 2015, some nine months after the stabbing at issue in this
                    case. The motion indicated that the assault arose from a dispute with
28                  a roommate, which allegedly culminated in Mann slashing the
                    roommate's finger with a knife. The motion acknowledged that the

                                              38

pending charge was relevant and admissible for the limited purpose of impeaching Mann's credibility under *People v. Wheeler* (1992) 4 Cal.4th 284 (*Wheeler*), and proposed that "the defense be allowed to ask Ms. Mann whether she is in fact being prosecuted for assaulting her roommate with a knife but to limit [cross-examination] to that one question."

Roberts' trial counsel opposed the motion, arguing that the circumstances underlying the pending charge were similar to the present case, inasmuch as both involved landlord/tenant disputes that ended in stabbings. Roberts' trial counsel also argued that Mann lied to police about the dispute with the roommate, which was probative of her credibility. The prosecutor responded that an assault charge is not as probative of credibility as an embezzlement or theft charge and, in any case, limited questioning would be sufficient to let the jury know that Mann had been charged with a crime of moral turpitude. The trial court expressed skepticism that the circumstances underlying the pending charge were relevant to the present case, adding, "At this point, since there has been no hearing, there has been no trial, there has been nothing proven, and we're not gonna have a little mini trial here on something that's pending that may very well be going to trial, I don't know." The trial court continued: "I am aware of my authority under Evidence Code Section 352, and it seems to me that to put on another trial within this one would be inappropriate and certainly confusing and overburdensome [for] the jury." Nevertheless, the trial court agreed to consider a police report relating to the pending charge which, in Roberts' trial counsel's view, raised serious questions about Mann's credibility.

The trial court reviewed the police report and found that the pending charge against Mann was only minimally probative of her credibility. The trial court explained: "After reading this report, there's a witness statement or there's a victim statement and what is labeled as a suspect statement. They are at odds with each other. There is nothing about these two reports that leads the court to believe that one or the other one is the one who's not telling the truth. This is a case that has to be tried." As far as Mann's credibility was concerned, the trial court continued, "I don't see anything in here that is a blatant lie as opposed to just inconsistent with what the victim said in that case." Accordingly, the trial court concluded, "I am exercising my discretion under [Evidence Code section] 352. I do not believe that this goes to her credibility in terms of her testimony and what happened in ... November of 2014. It's totally unrelated. And in reading it, I think it's just a case that has to be tried. [¶] So that's excluded."

The trial court made clear that Mann could be asked about her expectations in the pending case and whether any promises of leniency had been made to her, but not about the underlying facts. The trial court added, "But the reality of it is that she's gonna come in here in custody. It's not going to be a surprise that she's in custody, I'm assuming."

////

39

### 2. Analysis

Evidence that a witness has committed acts involving moral turpitude is generally relevant and admissible to impeach his or her credibility. (*People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24; *Wheeler, supra,* 4 Cal.4th at p. 295.) "Misconduct involving moral turpitude may suggest a willingness to lie [citations], and this inference is not limited to conduct which resulted in a felony conviction." (*Wheeler, supra,* at pp. 295-296.)

The trial court retains discretion to exclude impeachment evidence under Evidence Code section 352. (*Wheeler, supra,* 4 Cal.4th at pp. 295-296.) "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Thus, Evidence Code section 352 "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*Wheeler, supra,* at p. 296.)

"When exercising its discretion under Evidence Code section 352, a court must always take into account, as applicable, those factors traditionally deemed pertinent in this area. [Citations.] But additional considerations may apply when evidence other than felony convictions is offered for impeachment. In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler, supra,* 4 Cal.4th at pp. 296-297.)

We review a trial court's rulings regarding the admission or exclusion of evidence under Evidence Code section 352 for abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed unless the court acted in an "arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*People v. Clark, supra,* +52 Cal.4th at p. 932.)

We perceive no abuse of discretion here. True, assault with a deadly weapon is a crime of moral turpitude. (*People v. Elwell* (1988) 206 Cal.App.3d 171, 175.) However, " 'convictions which are assaultive in nature do not weigh as heavily in the balance favoring admissibility as those convictions which are based on dishonesty or some other lack of integrity.' " (*People v. Castro* (1985) 38 Cal.3d

40

301, 315.) And here, of course, there was no conviction, only a pending charge. (*Wheeler, supra,* 4 Cal.4th at pp. 296-297 [trial courts should exercise particular care in admitting impeachment evidence other than felony convictions].) What's more, the events giving rise to the pending charge postdated the stabbing by many months, rendering the link between the two cases even more tenuous. On this record, the trial court could reasonably conclude that the assault on the roommate was not sufficiently probative of Mann's veracity to warrant a time-consuming detour into what was, essentially, a swearing contest between disaffected roommates.

The trial court could also conclude that the superficial factual similarities between the two cases would be more likely to confuse or distract jurors than to help them decide whether Mann was worthy of belief. On this record, we have little difficulty concluding that the trial court properly weighed the potential for juror confusion and undue consumption of time against the probative value of the proffered evidence, and reasonably declined to permit a "mini trial" on a collateral issue with minimal probative value. Having concluded that there was no abuse of discretion, we likewise conclude there was no violation of Njoku's constitutional right to a fair trial. (*People v. Robinson* (2011) 199 Cal.App.4th 707, 716.)

Njoku, 2018 WL 6039321, at *14-16.

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with witnesses against him." U.S. Const. amend VI. This right is not limited to physical confrontation; "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974); see also Holley, 568 F.3d at 1098. "Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e. discredit, the witness." Id. To state a violation of the Confrontation Clause, the defendant must show that "he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors … could appropriately draw inferences relating to the reliability of the witness.'" Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (internal citation omitted). This right, however, does not render the trial judge toothless to enforce limits on cross-examination. Trial judges have broad discretion in limiting cross-examination based on concerns of irrelevance, prejudice, harassment,

41

1   confusion of issues, safety, and repetitive testimony.  Michigan v. Lucas, 500 U.S. 145, 149

2   (1991); see also Rock v. Arkansas, 483 U.S. 44, 55-56 (1987).  "Only rarely have we held that the

3   right to present a complete defense was violated by the exclusion of defense evidence under a

4   state rule of evidence."  Nevada v. Jackson, 569 U.S. 505, 509 (2013) (per curiam).

5        Here, the state appellate court reasonably concluded that the trial court did not abuse its

6   discretion in declining to allow the defense to introduce facts pertaining to a pending assault

7   charge against Jasmine Mann.  The Supreme Court has "never held that the Confrontation Clause

8   entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes."

9   Jackson, 569 U.S. at 512.  And there were compelling reasons to exclude the evidence in this

10  case.  As the state appellate court noted, the proposed extrinsic evidence concerned pending

11  assault charges without a conviction, did not involve an offense involving dishonesty, and

12  postdated the incident at issue in this case by months.  Njoku, 2018 WL 6039321, at *16.

13  Petitioner has not shown that no fairminded jurists could disagree with the correctness of the state

14  court's decision.  Richter, 562 U.S. at 101.  Although the trial court prohibited defense counsel

15  from introducing extrinsic evidence of the pending assault charge, defense counsel was allowed

16  to cross-examine Mann about whether she was in custody for a pending assault case and if she

17  received leniency in that unrelated case for her testimony.  (ECF No. 24-7 at 227-28.)  Based on

18  the record, it was not objectively unreasonable for the state court to conclude that "the trial court

19  properly weighed the potential for juror confusion and undue consumption of time against the

20  probative value of the proffered evidence, and reasonably declined to permit a 'mini trial' on a

21  collateral issue with minimal probative value" and there was no denial of a right to a fair trial.

22  Njoku, 2018 WL 6039321, at *16.  Because the state court's decision was not contrary to, or an

23  unreasonable application of, clearly established Supreme Court authority, this Court recommends

24  denying habeas relief on this claim.

25        F. Claims Six, Seven and Eight: Motion for a New Trial

26        Petitioner claims that the trial court violated his Fourteenth Amendment right to fair trial

27  by denying his motion for a new trial based on the prosecutor's Brady violation and by the

28  prosecutor's failure to correct Mann's false testimony.  (ECF No. 20 at 42-52.)  Specifically,

petitioner states that a day after her testimony, Mann entered a no contest plea to the misdemeanor count of assault with a deadly weapon and was sentenced to credit for time served plus three years of informal probation. (Id. at 44.) He asserts that the favorable resolution of Mann's assault case raises an inference that she received leniency in exchange for her testimony, and the prosecutor failed to disclose this plea agreement or correct Mann's testimony that she did not have an expectation of leniency. (Id. at 44-45.) After trial, petitioner discovered new evidence that the prosecutor engaged in similar misconduct in another case around the same time period. (Id. at 47.) Petitioner claims that his due process rights were violated when the prosecutor failed to correct Mann's false testimony. (Id. at 51-52.) In response, respondent argues that the state court's rejection of petitioner's plea bargaining timing speculation claims was reasonable. (ECF No. 25 at 35-40.)

The state court addressed this claim as follows:

> Next, Njoku argues the trial court erred in denying her motion for a new trial based on an alleged *Brady* violation and/or newly discovered evidence. Njoku fails to show that the trial court abused its discretion in denying the motion.
>
> *1. Additional Background*
>
> Mann testified in custody over the course of two days in October 2015. On cross-examination by Roberts' trial counsel, Mann was asked whether she expected to receive leniency in exchange for her testimony. Mann responded, "Uh, no, this has nothing to do with that case." The following colloquy occurred:
>
> "[Roberts' trial counsel:] So you're not looking for—you don't have any expectation of the District Attorney's Office helping you with that case?
>
> "[Mann:] No. No. No.
>
> "[Roberts' trial counsel:] No discussions at all?
>
> "[Mann:] No, not at all."
>
> Later, on cross-examination by Njoku's trial counsel, Mann was asked, "You told us you're currently being charged with an incident?" Mann responded, "I'm not being charged. I'm going to actually beat the case." The following colloquy then took place:
>
> "[Njoku's trial counsel:] I believe you said you have an assault case based on protecting your daughter?

"[Mann:] Yes

"[Njoku's trial counsel:] That's why you're in custody, correct?

"[Mann:] Yes."

Mann completed her testimony, subject to recall, on October 6, 2015. On October 7, 2015, Mann appeared in another department of the superior court and entered a no contest plea to a misdemeanor count of assault with a deadly weapon (§ 245, subd. (a)(1) ). She was sentenced to credit for time served (59 actual days plus conduct days for a total of 117 days) and placed on three years of informal probation. The prosecutor did not disclose the plea agreement to the defense.

The jury returned its verdicts on October 22, 2015. Prior to sentencing, Njoku's counsel filed a motion for a new trial arguing that (1) the prosecution violated *Brady*, and (2) the existence of the plea agreement established the falsity of Mann's trial testimony, and therefore constituted newly discovered evidence within the meaning of section 1181, subdivision (8). The prosecution opposed the motion, arguing that the plea agreement was neither exculpatory nor newly discovered evidence. In support of the opposition, the prosecution submitted the declaration of Deputy District Attorney Nicole Shaker, the prosecutor responsible for handling the case against Mann. Shaker averred that she never discussed Mann's case with the prosecutor responsible for handling the present case. Shaker also averred that Mann's testimony was not a factor in plea negotiations or the ultimate disposition of the assault charge.

The trial court heard argument on the motion for a new trial May 27, 2016. During the hearing, Njoku's trial counsel suggested that the terms of the plea agreement were so generous as to raise an inference that Mann received leniency in exchange for her testimony. Building on this premise, Njoku's trial counsel argued that the timing of the plea agreement raised an inference that Mann had an expectation of leniency at the time of her testimony, and testified falsely when she denied having any such expectation. Njoku's trial counsel maintained that Mann's undisclosed expectation of leniency would have been relevant to impeach her and could have changed the outcome of the trial. Njoku's trial counsel also argued that the prosecutor had a duty to correct Mann's purportedly false testimony.

The trial court rejected these arguments. The trial court began by rejecting the notion that there was anything suspicious about the timing of the plea agreement. The trial court recalled that Mann was originally scheduled to appear in the assault case on October 5, 2015. However, the appearance was continued for two days at the trial court's request so Mann could testify in the present case. The trial court concluded, "there's no hidden agenda as to the timing." The trial court also rejected the inference that Mann must have been lying when she denied having any expectation of leniency, and Njoku's contention that Mann received an unusually generous plea bargain.

In the end, the trial court rejected the motion for a new trial based on

44

newly discovered evidence, stating, "The court cannot conclude on this record that there was a suppression of a plea agreement that included any consideration for leniency for the witness based on her testimony. The timing alone does not do that. [¶] We have no idea what negotiations went on between the attorneys prior to the date that Ms. Mann entered her plea. We don't know that she wouldn't have been entering a plea had she not been sitting here testifying on October 4th [*sic*], which is how it turned out. Nor can the court conclude that her testimony was false. [¶] The evidence just simply does not support a finding that the prosecutor knowingly used false or misleading testimony."

The trial court also rejected the motion for a new trial based on a *Brady* error, finding that Njoku failed to show the existence of an undisclosed agreement or understanding that Mann would receive leniency in exchange for her testimony, failed to show that any such agreement or understanding was suppressed, and failed to show prejudice. Accordingly, the trial court rejected the new trial motion in its entirety.

### 2. Analysis

Njoku contends the new trial motion should have been granted based on the prosecutor's misconduct in not disclosing the plea agreement under *Brady*. Njoku also contends the motion should have been granted on the grounds that the prosecutor failed to correct Mann's purportedly false testimony. We are not persuaded by either argument.

Section 1181, subdivision 8 permits one convicted of a crime to move for a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

Evidence that merely impeaches a witness will not ordinarily be significant enough to make a different result probable. (*People v. Huskins* (1966) 245 Cal.App.2d 859, 862.) In the present case, however, the evidence was not just alleged to have been newly discovered, but also alleged to have been suppressed in violation of *Brady*. Accordingly, Njoku's due process rights are implicated, raising a question as to the proper standard of review.

Generally speaking, a motion for a new trial on the ground of newly discovered evidence is looked upon with disfavor, and the trial court's ruling is reviewed for abuse of discretion. (*People v. Delgado, supra,* 5 Cal.4th at p. 328; *People v. Shoals* (1992) 8 Cal.App.4th 475, 485-486.) Our Supreme Court has held that the

abuse of discretion standard also applies to new trial motions based on asserted *Brady* violations. (*People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27.) In that circumstance, the court has explained, "the asserted abuse of discretion is the asserted failure of the trial court to recognize violations of defendant's constitutional rights." (*Ibid.*) We therefore review the trial court's ruling for abuse of discretion. (*Ibid.*; see also *People v. Davis* (1995) 10 Cal.4th 463, 524 [" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears" ' "].)

"Under *Brady*, the prosecution violates a defendant's federal due process rights when it suppresses evidence material to the defendant's guilt or punishment, regardless of the good faith belief of the prosecution. [Citation.] Prosecutors have a duty to disclose 'material exculpatory evidence whether the defendant makes a specific request [citation], a general request, or none at all [citation].' [Citation.] There are three elements to a *Brady* violation: (1) the state withholds evidence, either willfully or inadvertently, (2) the evidence at issue is favorable to the defendant, either because it is exculpatory or impeaching, and (3) the evidence is material. [Citation.] As to the last element, '[e]vidence is material if there is a reasonable probability its disclosure would have altered the trial result.' [Citation.] Put another way, the defendant must show that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [Citation.] 'Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.] Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review.' [Citation.]" (*People v. Lewis* (2015) 240 Cal.App.4th 257, 263.)

We perceive no abuse of discretion in the trial court's determination that Njoku failed to establish a *Brady* violation. As the trial court observed, there was no evidence that Mann expected or received leniency in exchange for her testimony. And the plea agreement, though relevant to impeach Mann's false statement that she had not been charged with a crime, was not directly relevant to any disputed issue in the case. Although Mann's credibility was obviously an important issue in the case, there was no reasonable probability that disclosure of the plea agreement would have altered the trial result, as her false testimony was immediately corrected on the record. In any event, the jury was well aware that Mann was testifying in custody on an unrelated charge, and defense counsel had ample opportunity to cross-examine Mann on whether she had an agreement to testify in a certain manner to satisfy the prosecutor. On the record before us, the trial court could reasonably conclude that the evidence of Mann's plea agreement was not reasonably likely to have altered the trial result, and the absence of such evidence would not undermine confidence in the jury's verdict. We therefore find no abuse of discretion in the denial of the new trial motion based on the asserted *Brady* violation.

1

2

3

4

5

> Nor do we find any abuse of discretion in the denial of the motion based on newly discovered evidence. In the trial court, Njoku argued that the plea agreement establishes the falsity of Mann's trial testimony. On appeal, Njoku argues that the prosecutor failed to correct Mann's false testimony. Both arguments ignore the fact that Mann's false statement was immediately corrected on the record. Njoku makes no attempt to demonstrate the trial court abused its discretion in rejecting her argument, and we discern no basis for so concluding. We therefore reject the claim of prejudicial error.

6

Njoku, 2018 WL 6039321, at *16-19.

7

The state habeas court also rejected claim that he has new evidence to support his claim:

8

9

10

11

12

13

> Petitioner's "new evidence" is a motion for a new trial submitted in a different case (14F08237). In the motion, the defense argued that Deputy District Attorney ("DDA") Thomas Asker, the prosecutor in petitioner's case, violated Brady by failing to disclose a letter from a witness who asked for help with his federal case. Additionally, the motion alleged DDA Asker knew the witness was lying when the witness denied having sought assistance with his case. Petitioner argues this evidence, when combined with the evidence cited in his motion for a new trial, warrants granting of habeas relief. He is mistaken.

14

15

16

> The motion petitioner presents as evidence is just that – a motion. It is not, as petitioner would presumably have the Court believe, evidence of a pattern of misconduct. In fact, the motion was withdrawn before it ruled upon. Further even if the motion had been granted, however, it would not constitute evidence of what happened in petitioner's case.

17

18

> Petitioner's arguments on this point were rejected by the trial court, the appellate court, and now, this Court.

19

(ECF No. 24-24 at 3-4) (noting that this claim was raised on direct appeal).

20

The Supreme Court has made clear that the "deliberate deception of a court and jurors by

21

the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"

22

Giglio v. United States, 405 U.S. 150, 153 (1972) (citing Mooney v. Holohan, 294 U.S. 103, 112

23

(1935)).  The state violates a defendant's right to due process when it suppresses evidence

24

favorable to the defendant that is material to guilt or punishment.  Brady v. Maryland, 373 U.S.

25

83, 87 (1963).  Evidence is material if it creates a reasonable probability of a different result; the

26

relevant inquiry is whether defendant received a fair trial in the absence of the material evidence.

27

Kyles v. Whitley, 514 U.S. 419, 434 (1995); see also Smith v. Cain, 565 U.S. 73, 75 (2012).  To

28

establish a Brady violation, petitioner must show that "[t]he evidence must be favorable to the

47

1   accused, either because it is exculpatory, or because it is impeaching; that evidence must have

2   been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

3   Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

4          The state also may not use false evidence to obtain a criminal conviction.  Napue v.

5   Illinois, 360 U.S. 264, 269 (1959).  "[A] conviction obtained by the knowing use of perjured

6   testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that

7   the false testimony could have affected the judgment of the jury."  United States v. Agurs, 427

8   U.S. 97, 103 (1976) (footnotes omitted).  To state a successful claim, petitioner must show that

9   (1) the testimony was false, (2) the prosecutor knew or should have known that the testimony was

10  false, and (3) the false testimony was material.  United States v. Zuno-Arce, 339 F.3d 886, 889

11  (9th Cir. 2003); see also Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) ("Thus, the

12  rule has been clear for decades: a criminal defendant is denied due process of law when a

13  prosecutor either knowingly presents false evidence or fails to correct the record to reflect the true

14  facts when unsolicited false evidence is introduced at trial.")

15         The state court's determination that the trial court did not abuse its discretion in denying

16  the new trial motion was not objectively unreasonable.  Petitioner must provide evidence, not

17  merely vague allegations, to support his claims that the prosecutor failed to disclose a leniency

18  agreement or failed to correct false testimony.  See, e.g., Weary v. Cain, 577 U.S. 385, 392-93

19  (2016) (per curiam); Strickler, 527 U.S. at 282; Giglio, 405 U.S. at 153; United States v. Shaffer,

20  789 F.2d 682, 689 (9th Cir. 1986); Zuno-Arce, 339 F.3d at 890-91. The trial court and state

21  appellate court noted that there is no evidence in the record that Mann expected or actually

22  received leniency in her assault case in exchange for her testimony.  Without evidence, petitioner

23  cannot show that the prosecutor failed to disclose favorable evidence or knew or should have

24  known of the false testimony.  Petitioner's unsupported assertion that Mann must have been

25  offered a deal because of the generousness and timing of her plea is insufficient for habeas relief.

26  (ECF No. 20 at 43); see Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995); James v. Borg, 24

27  F.3d 20, 26 (9th Cir. 1994).  Even if there was evidence of a leniency deal, based on the trial

28  record, the state court reasonably concluded that it would not have altered the trial result or

1    undermined the confidence in the jury's verdict.  Furthermore, it was not objectively

2    unreasonable for the state habeas court to conclude that evidence of Asker's misconduct in

3    another case is not adequate to establish a "pattern of misconduct" or to constitute evidence of

4    what happened in this case.  (ECF No. 24-24 at 3.)  The state court's decision was not contrary to,

5    or an unreasonable application of, clearly established Supreme Court authority, and this Court

6    recommends denying habeas relief.

7           G.  Claim Nine: Cumulative Error

8           Petitioner's last claim is that the cumulative effect of the errors alleged herein constitute a

9    denial of due process.  (ECF No. 20 at 52-53.)  The state appellate court rejected this claim.

10   Njoku, 2018 WL 6039321, at *27.

11          The Ninth Circuit has concluded that under clearly established United States Supreme

12   Court precedent the combined effect of multiple trial errors may give rise to a due process

13   violation if it renders a trial fundamentally unfair, even where each error considered individually

14   would not require reversal.  Parle, 505 F.3d at 927 (citing Donnelly, 416 U.S. at 643, and

15   Chambers v. Mississippi, 410 U.S. 284, 290 (1973)).  "[T]he fundamental question in

16   determining whether the combined effect of trial errors violated a defendant's due process rights

17   is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a

18   'substantial and injurious effect or influence' on the jury's verdict."  Parle, 505 F.3d at 928

19   (internal citations omitted); see also Hein, 601 F.3d at 917.

20          This Court has addressed each of petitioner's claims and has concluded that no error of

21   constitutional magnitude occurred.  This Court also concludes that the alleged errors, even when

22   considered together, did not render petitioner's defense "far less persuasive," nor did they have a

23   "substantial and injurious effect or influence on the jury's verdict."  Accordingly, petitioner is not

24   entitled to relief on his claim of cumulative error.

25   VI.  Conclusion

26          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

27   habeas corpus be denied.

28          These findings and recommendations are submitted to the United States District Judge

49

1   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

2   after being served with these findings and recommendations, any party may file written

3   objections with the court and serve a copy on all parties.  Such a document should be captioned

4   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

5   he shall also address whether a certificate of appealability should issue and, if so, why and as to

6   which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

7   applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

8   § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

9   service of the objections.  The parties are advised that failure to file objections within the

10  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

11  F.2d 1153 (9th Cir. 1991).

12  Dated:  January 20, 2023

13

14  KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

15

16  TAA/robe0872.157

17

18

19

20

21

22

23

24

25

26

27

28

50